STATE of Missouri ex rel., David
L. BROWN, Appellant,

v.

III INVESTMENTS, INC., A Missouri
Corporation, Respondent.

No. WD 65043.

Missouri Court of Appeals,
Western District.

Jan. 3, 2006.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 28, 2006.

Application for Transfer Denied
April 11, 2006.

As Modified April 27, 2006.

Arthur A. Benson, II, Kansas City, MO, for appellant.

Michael W. Lerner, Overland Park, KS, for respondent.

Before: HAROLD L. LOWENSTEIN, P.J., JOSEPH M. ELLIS, and THOMAS H. NEWTON, JJ.

THOMAS H. NEWTON, Judge.

David L. Brown brings a second appeal[1] to this court in his effort to gain access to the financial records of respondent's subsidiary corporations. He is seeking access so that he can place a value on the parent-company shares he holds and wishes to sell. On remand from this court, the circuit court conducted a hearing to determine, among other matters, whether III Investments, Inc. (referred to by the parties and herein by its acronym Five I), asserted sufficient control over its subsidiaries to warrant inspection of their books and records of account. For a second time, the circuit court has denied Mr. Brown's Petition for Mandamus respecting Five I's subsidiary corporations. Because we find that the circuit court erred in its application of the law, we hereby reverse.

---

1. For our first opinion in this litigation see *State ex rel. Brown v. III Investments, Inc.,* 80 S.W.3d 855 (Mo.App. W.D.2002).

In 1998, Mr. Brown was terminated from his position as vice-president of a Five I subsidiary known as Information Industries Incorporated (Triple I). When he was terminated, he owned 27,540 shares of stock in Five I, or 2.68% of the outstanding shares. He and Five I's president/director Robert Spachman discussed the purchase of Mr. Brown's shares, but they were unable to agree on a price. Mr. Brown submitted a written request to inspect a list of corporate documents. Thereafter, Mr. Brown was removed from Five I's board of directors, and his request was denied. In November 1998, he again asked to inspect the books and records of the company and its subsidiaries, specifically identifying the types of documentation he was seeking. While some documents were forthcoming, others were withheld, and Mr. Brown filed a Petition and Writ of Mandamus in the Jackson County circuit court.

We reversed the circuit court's first judgment, which denied Mr. Brown's common law claim of inspection, *State ex rel. Brown v. III Invs., Inc.*, 80 S.W.3d 855, 861 (Mo.App. W.D.2002) (Brown I). The case was remanded for further proceedings on several grounds, and we stated that if the issue arose on remand, the circuit court should examine Five I's corporate structure and its relationship with its subsidiaries to determine, under *State ex rel. United Brick & Tile Co. v. Wright*, 339 Mo. 160, 95 S.W.2d 804, 808 (1936), "whether Five I asserted sufficient control over the various subsidiaries to warrant inspection of their books." *Brown I*, 80 S.W.3d at 866. This issue did arise on remand, and the circuit court, basing its decision "especially" on the credibility of the witnesses and the weight and value of

the evidence presented during extensive hearings, ruled that Five I had not "asserted sufficient control" over its subsidiaries to allow Mr. Brown to inspect their books. Mr. Brown claims that the circuit court's judgment was in error due to a misapplication of the law and because it was against the weight of the evidence.

■ Five I has filed a Motion to Dismiss, which was taken with the case. Five I contends that Mr. Brown's statement of the facts is argumentative and not a fair statement of the facts relevant to the questions presented for our determination and thus violates Rule 84.04(c).[2] Five I cites *Finnical v. Finnical*, 81 S.W.3d 554 (Mo. App. W.D.2002), to support its contention that we may dismiss an appeal for an appellant's failure to provide a fair statement of the facts. We would note that there were numerous deficiencies in the *Finnical* briefs, and it was *substantial* noncompliance with Rule 84.04 that led to our dismissal of the appeal and cross-appeal in that case. Notwithstanding an appellant's failure to comply with our rules of appellate procedure, we retain the discretion to decide appeals on the merits when such failure prejudices neither the respondent nor our review, *Butterbaugh v. Pub. Water Supply Dist. No. 12, of Jackson County*, 512 S.W.2d 445, 447 (Mo.App. 1974), and the issues presented are important. *State v. Miller*, 815 S.W.2d 28, 31 (Mo.App. E.D.1991). While Mr. Brown may have omitted from his statement of the facts some of the evidence that Five I deems relevant, we do not find prejudice to the respondent or our review, and will therefore exercise our discretion to render a judgment on the merits. *Id.*

We sustain the circuit's court's judgment unless "no substantial evidence exists to

---

**2.** All rule references are to the Missouri Rules of Civil Procedure (2005), unless otherwise

indicated.

support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *State ex rel. Mid–Mo. Limestone, Inc. v. County of Callaway,* 962 S.W.2d 438, 440 (Mo.App. W.D.1998). (citation and internal quotations omitted). Further, the denial of a writ of mandamus is an appealable order when the merits are reached by the court. *Irvin v. Kempker,* 152 S.W.3d 358, 359–60 (Mo.App. W.D. 2004) As to questions of law, our review is *de novo. Commerce Bank, N.A. v. Blasdel,* 141 S.W.3d 434, 442 (Mo.App. W.D. 2004). And we must view the evidence in the light most favorable to the prevailing party. *Bailey v. Federated Mut. Ins. Co.,* 152 S.W.3d 355, 357 (Mo.App. W.D.2004).

Viewing the evidence in the light most favorable to the prevailing party, Missouri-based Five I is essentially a shell corporation with no employees.[3] Five I invested in other companies that provide information technology (IT) services in a number of other states. President Robert Spachman holds approximately 97% of the shares in Five I, which, in turn, holds 100% of the shares in Triple I, the only subsidiary that currently exists. Triple I had a significant ownership interest in each of the subsidiaries. Mr. Spachman is also the president of Triple I. Mr. Spachman and Mr. Brown, who in 1998–99 were Five I's only shareholders, devised a strategy whereby Five I would select individuals to be involved as partners in new subsidiary corporations, and Five I would invest in those companies. Mr. Spachman and Mr. Brown served on a number of the subsidiary boards of directors. At its peak in 1999, Five I had some eleven subsidiaries, which have since merged or ceased to exist.[4]

The subsidiaries were free to hire their own employees and determine what products and services would be marketed to customers that the subsidiaries identified. One of those subsidiaries, which Mr. Spachman also headed as president, provided a number of administrative services for the others, including payroll, accounting, auditing, insurance, and human resources such as employee benefits administration.[5] A single line of credit was also available for Five I and all of its subsidiaries. Because Five I held significant ownership interest in its subsidiaries, the federal tax returns for all were combined with Five I's return to offset gains for some with the losses of the others.

In *United Brick & Tile,* the Missouri Supreme Court considered what type of corporate structure and parent/subsidiary relationship would compel an examination of the subsidiaries' corporate books. 95 S.W.2d at 807–08. The court discussed the standard applied when tort liability is at issue, noting that in this situation "the dominion [of the subsidiary by the parent] may be so complete, interference so obtrusive, that by the general rules of agency

3. The facts relating to Five I's corporate structure and the relationship between Five I and its subsidiaries were provided by the testimony of Five I's president, director, and majority shareholder Mr. Robert Spachman and the exhibits Five I introduced.

4. According to Mr. Spachman, Five I achieved the reorganizations of its subsidiaries by voting its majority shares, and Triple I ended up with a direct ownership interest in the reorganized companies. Five I's strategy document called for the company to "[a]dd experienced personnel to strategically important positions," "eliminate low profit [businesses]" and "replace leadership that does not [consistently meet commitments and standards]." L.F. at 55. The authority to eliminate subsidiaries and appoint and replace personnel is a significant indication of control.

5. These administrative functions are currently being provided by Triple I, which also holds the assets and books of the former subsidiaries.

the parent will be a principal [in the conduct of the business] and the subsidiary an agent." *Id.* at 808 (citation and internal quotations omitted). Nevertheless, the court stated, "Even *greater liberality* would be indulged in a proceeding, such as this, to compel an examination of corporate books." *Id.* (emphasis added). While the Missouri Supreme Court did not articulate what manner of control must be shown to allow a shareholder to examine a subsidiary's financial records, the standard we apply is *not*, as argued by Five I, the standard the courts use in piercing the corporate veil to impose tort liability.

The parent in *United Brick & Tile* was a holding company that owned the entire capital stock of the operating company. *Id.* at 807. The officers of the holding company elected the officers of the operating company, which were nearly identical to the holding company officers. *Id.* The holding company officers also "dominated and controlled the operations of the operating company and dominated and controlled the keeping of [the] corporate books of the holding company." *Id.* The holding company had no business other than that exercised in controlling the operating company, and the sole source of the holding company's income was through its ownership of the operating company's stock. *Id.* The operating company's corporate records were controlled by the holding company. *Id.* The Missouri Supreme Court found such domination sufficient not only to allow an examination of the operating company's books by a holding company shareholder, but also to have held the parent liable for a tort committed by the subsidiary, had that been at issue. *Id.* at 808. Thus, the control exercised in *United Brick & Tile,* which would have met the more stringent tort-liability/principal-agent standard, was greater than what was actually needed to allow a simple inspection of the subsidiary books.

◼ In our case, the only matters that Five I's principle shareholder, president, and director did not control were the particular services offered by the subsidiaries,[6] the markets they chose to operate in, the contracts they entered and the hiring and firing of subsidiary employees. While the subsidiaries were not required to use the administrative services offered by another of Five I's subsidiaries, most did so because it was more efficient and less costly. And according to Five I's corporate strategy, such costs savings were required.[7] The subsidiaries also shared computer software. In every other respect, from financing start-up to selecting subsidiary leadership and serving as president and director of the subsidiary that provided administrative [8] and financial support to all of the subsidiaries, it is clear that Mr. Spachman and the parent company dominated the subsidiaries, particularly with respect to their finances.

◼ We believe that the circuit court, in interpreting our directive in *Brown I* to consider the extent to which Five I asserted control over its subsidiaries, confused the more liberal standard enunciated in *United Brick & Tile* with the test for control used when piercing the corporate

---

6. If a subsidiary decided to enter the construction industry or open a restaurant or make high-end fashions, it would not come within Five I's corporate strategy of funding companies that were engaged in IT services and would not, therefore, long remain under the Five I umbrella. Thus, subsidiary autonomy in offering services was not unfettered.

7. *See* L.F. at 55 ("Reduce expenses wherever possible. Improve the productivity and results of 'overhead' costs.").

8. *Id.* ("Add experienced personnel to strategically important positions.").

veil to impose tort liability. We do not believe that day-to-day control of a company's operations is necessary to compel an examination of a subsidiary's corporate books by a parent-company shareholder, and thus find that the circuit court erred in applying the law. For that reason, we cannot sustain its judgment. *Mid–Mo. Limestone, Inc.,* 962 S.W.2d at 439.

While there was control by the parent over the day-to-day operations of the subsidiary in *United Brick & Tile,* the court in that case called for "greater liberality" in finding control for purposes of examining corporate records. 95 S.W.2d at 808. That the parent company existed only to invest in its subsidiaries, that there was a significant overlap in corporate board and leadership between parent and subsidiaries, that the subsidiary leadership was hand picked by the parent's officers and only shareholders, and that the parent and subsidiaries held debt and filed taxes in common are sufficient indicia of an assertion of control for a parent-company shareholder to simply examine the financial documents requested of the *subsidiaries.*[9]

Accordingly, we reverse and remand for further proceedings.

HAROLD L. LOWENSTEIN, P.J., and JOSEPH M. ELLIS, J. concur.

---

9. As to which documents were actually requested and whether the documents should include updated information are matters not before this court and will be for the circuit court to consider on remand.