# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00285-CV

**CenterPoint Energy Houston Electric, LLC and Public Utility Commission of Texas Appellants**

**v.**

**Gulf Coast Coalition of Cities, Texas Industrial Energy Consumers, the State of Texas and Occidental Power Marketing, L.P., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. GN503381, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

## O P I N I O N

CenterPoint Energy Houston Electric, LLC, and the Public Utility Commission each appeal from a district court judgment reversing and remanding portions of the Commission's July 14, 2005 Order in Docket No. 30706.[1] The order had authorized CenterPoint to recover certain costs through a competition transition charge. The district court held that the Commission erred by authorizing CenterPoint to impose an improper interest rate on the uncollected balance of the charge, by allowing CenterPoint to recover certain expenses through the charge whose recovery was barred by statute, and by exceeding its authority in requiring any end-use customers who switch to new

---

[1] *Application of CenterPoint Energy Houston Electric, LLC for a Competition Transition Charge*, PUC Docket No. 30706 (July 14, 2005) (order), *available at* http://interchange.puc.state.tx.us (accessed July 6, 2008).

on-site electricity generation to continue paying the charge. For reasons we explain below, we will reverse the district court's judgment and render judgment affirming the Commission's order.

## BACKGROUND

**Statutory context**

Before turning to the specific events giving rise to these appeals, it is helpful to note some features of their statutory context that will be relevant to our analysis. These appeals arise within the statutory regime governing Texas's transition toward a competitive retail market for electricity, which this Court has described in detail in several previous opinions.[2] At issue here are certain statutes that govern the types of costs that electric utilities can recover in the transition, and how and from whom those costs may be recovered.

Among the legislature's "foundational" policy goals in these statutes, found mainly in chapter 39 of the Public Utility Regulatory Act (PURA), was ensuring that incumbent, formerly integrated electric utilities were made whole for their "stranded costs." The now-familiar term "stranded costs" under PURA chapter 39 refers generally to "the portion of the book value of a utility's generation assets that is projected to be unrecovered through rates that are based on market prices," *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d

---

[2] *See, e.g.*, *CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 252 S.W.3d 1, 3-19 (Tex. App.—Austin 2008, pet. filed); *State v. Public Util. Comm'n*, 246 S.W.3d 324, 333-35 (Tex. App.—Austin 2008, pet. filed); *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 684-88 (Tex. App.—Austin 2005, pet. denied); *Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129, 133-36 (Tex. App.—Austin 2003), *rev'd on other grounds sub nom*, *CenterPoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004).

681, 685 (Tex. App.—Austin 2003, pet. denied); *see* Tex. Util. Code Ann. § 39.251(7) (West 2007),[3] thereby "stranding" costs of the utility's prior investments in generation assets that the utility had made with the expectation of recovering (and would have recovered) under the prior rate-regulated regime. *Cities of Corpus Christi*, 188 S.W.3d at 685 (observing that "[s]tranded costs are a potential byproduct of Texas's transition from the former rate-regulated electricity system to competition"). The prospect of stranded costs placed incumbent utilities at a competitive disadvantage relative to new market entrants. *Id.* ("Because the new market entrants would not have these embedded generation-related costs and opportunity cost reflected in the rate of return, their pricing structure would tend to be lower than that of incumbent utilities . . . enabl[ing] new market entrants to price electricity below a level at which incumbent utilities could recover their investments," forcing them either to "charge uncompetitive higher rates or simply absorb these 'stranded costs.'"). To address such concerns, the legislature created a three-phase regulatory program through which utilities could recover their "net, verifiable, non-mitigable stranded costs incurred in purchasing power and providing electric generation service." *See* Tex. Util. Code Ann. § 39.252(a) (West 2007). In the first phase, which ended on December 31, 2001—the last day before the beginning of customer choice—utilities that had been identified in the 1998 ECOM report as having had potential stranded costs were permitted to employ a range of accounting tools to mitigate such costs. *See Cities of Corpus Christi*, 188 S.W.3d at 686. In the subsequent phases, the legislature authorized utilities to recover estimated stranded costs through their rates.

---

[3] Throughout our opinion, where the relevant language of a statute has not changed in a manner material to our analysis, we will cite to the current version for convenience.

In advance of the second phase, which was to begin with customer choice on January 1, 2002, utilities were required to file proposed tariffs that their post-"unbundling" transmission and distribution utility (TDU) component would begin charging retail electric providers (REPs) on that date for the transmission and delivery of power over their respective systems. *See* Tex. Util. Code Ann. § 39.201(a) (West 2007). Among the components of the tariff were certain nonbypassable delivery charges—charges that REPs were required to bill their end-use customers. *Id.* § 39.201(b) (West 2007). One of the nonbypassable delivery charges that potentially could have been imposed was a "competition transition charge" or "CTC" that the legislature authorized as a means for utilities to recover projected stranded costs through their rates. *Id.* Each utility that had been identified in the 1998 ECOM report as having potential stranded costs was to calculate revised projections of its stranded costs by inputting updated data into the ECOM model. *Id.* § 39.201(g), (h) (West 2007). If, based on this estimate, stranded costs were still projected to remain as of December 31, 2001, the Commission was to authorize the utility to implement a CTC as a means of recovering those costs. *Id.* § 39.201(f) & (i) (West 2007). In addition to recovering stranded costs through a CTC, utilities could, as early as the first phase of stranded-cost recovery, "securitize" up to 75 percent of their estimated stranded costs or 100 percent of their regulatory assets. *Id.* § 39.201(i)(1). Securitization, simply described, involves the utility recovering a lump sum payment financed by bonds serviced by a nonbypassable delivery charge upon REPs, termed a "transition charge" (TC). *See generally id.* §§ 39.301-.313 (West 2007 & Supp. 2007). As it turned out, the 2001 ECOM stranded-cost estimates indicated that no incumbent utilities had

projected stranded costs; hence, no CTCs to recover such costs were implemented during this second stranded-cost recovery phase.[4]

In the third and final phase, a final estimate of each utility's stranded costs was to be calculated in a "true-up" proceeding initiated sometime after January 2004. *Id.* § 39.262 (West 2007 & Supp. 2007). By this time, the formerly integrated utility was to have been "unbundled" into a TDU, a generating company, and an REP. *Id.* § 39.262(c). This stranded cost estimate or "true-up balance" was to be derived principally from calculations of the generation assets' market value, that, except for certain nuclear assets, were to be based on one of several alternative market-based measures of that value. *Id.* § 39.262(h) & (i). This stranded cost estimate was to be "reconcile[d] . . . with the estimated stranded costs used to develop the competition transition charge" (i.e., the 2001 ECOM projection) and "[a]ny resulting difference shall be applied to the nonbypassable delivery rates of the transmission and distribution utility, except that at the utility's option, any or all of the amounts recovered under this section may be securitized." *Id.* § 39.262(c). If a CTC had previously been implemented to recover estimated stranded costs, the legislature required the following adjustments:

> If, based on [the final true-up], the competition transition charge is not sufficient, the commission may extend the collection period for the charge or, if necessary, increase the charge. Alternatively, if it is found in the true-up proceeding that the competition transition charge is larger than is needed to recover any remaining stranded costs, the commission may:

---

[4] The revised estimates, in fact, indicated that some of the utilities had "over-recovered" stranded costs through prior mitigation efforts, to which the Commission responded by ordering utilities to refund "excess mitigation credits." *See Cities of Corpus Christi*, 188 S.W.3d at 688. We addressed the Commission's authority to impose those measures in *Cities of Corpus Christi*. *Id.* at 688-93.

(1)    reduce the competition transition charge, to the extent it has not been securitized;

(2)    reverse, in whole or in part, the depreciation expense that has been redirected under Section 39.256;

(3)    reduce the transmission and distribution utility's rates; or

(4)    implement a combination of the elements in Subdivisions (1)-(3).

In addition to these stranded cost-related adjustments, the legislature also required that the utility's nonbypassable rates it charges to REPs be adjusted upward or downward based on other balances determined in the final true-up. *Id.* § 39.262(g). These were:

- **Capacity auction true-up balance**. As this Court has detailed elsewhere, the capacity auction process entailed the utility's auctioning off entitlements to its generating capacity. *See CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 252 S.W.3d 1, 47-50 (Tex. App.—Austin 2008, pet. filed); Tex. Util. Code Ann. § 39.153 (West 2007). The capacity auction true-up balance "constitutes the difference between the price that the utility was predicted to obtain by the ECOM model [in 2001] for selling its power on the wholesale market and the predicted fuel costs offset by the difference between the price that utility actually obtains in the capacity auctions and the utility's actual fuel costs." *CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 49; *see* Tex. Util. Code Ann. § 39.262(d)(2). If the difference between the actual price obtained and the actual fuel costs was less than the difference between the projected price and projected fuel costs, the utility was allowed to recover the difference; conversely, if the utility's actual margins proved to be larger than those predicted in the 2001 ECOM projections, it was required to disgorge the difference. *See CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 49-50. In this respect, the capacity auction process served to "guarantee consumers and power companies that the power company will receive no more and no less than a margin predetermined by the Commission in 2001 when the ECOM model was run," thereby protecting both consumers and utilities from the effects of interim distortions and fluctuations in electricity and fuel prices during the early development of the retail electric market. *CenterPoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81, 96 (Tex. 2004).

6

- **Final fuel reconciliation**.  After customer choice began, the utility's affiliated power generation company was required to file, as part of the final true-up, a final fuel reconciliation (reconciling the revenues received under the fuel factor in its rates with actual fuel costs) for the period ending on the last day before customer choice began, December 31, 2001. Tex. Util. Code Ann. § 39.202(c) (West 2007); *see Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129, 133-36 (Tex. App.—Austin 2003), *rev'd on other grounds sub nom*, *CenterPoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004).  The utility's affiliated power generation company was to reconcile these figures and add any under-recovered fuel balances to the capacity auction true-up balance (or subtract any over-recovered fuel balances).  Tex. Util. Code Ann. § 39.262(d). Depending on whether the sum was positive or negative, the power generation company then either credited or billed the TDU.  *Id.*

- **The "retail clawback"**.  The utility's affiliated REP was required to credit the utility any positive difference between the "price to beat"—the price that REPs affiliated with incumbent utilities were required to charge upon the advent of customer choice—and the prevailing market price of electricity during the same time period, net of the utility's nonbypassable delivery charges to the REP, up to a cap of $150 per customer.  *Id*. § 39.262(e).

- **Regulatory asset amount**.  To the extent that any amount of regulatory assets included in a TC or CTC exceeded the amount of regulatory assets approved in a rate order that became effective on or before September 1, 1999, the Commission was required to conduct a review during the final true-up to determine whether any such amounts "were appropriately calculated and constituted reasonable and necessary costs."  *Id*. § 39.262(f). If the Commission found that the amount of regulatory assets approved for securitization was subject to modification, a credit or other rate adjustment was to be made to the utility's nonbypassable delivery rates, subject to the limitation that no adjustment could be made to a TC.  *Id.*

PURA section 39.262(g) then required the utility to pass along these additional costs or refunds to

REPs and, ultimately, to end-use customers:

> Based on the[se] credits or bills received from its affiliates . . . the transmission and distribution utility shall make necessary adjustments to the nonbypassable delivery rates it charges to retail electric providers.  If the commission determines that the

nonbypassable delivery rates are not sufficient, the commission may extend the original collection period for the charge or, if necessary, increase the charge. Alternatively, if the commission determines that the nonbypassable delivery rates are larger than are needed to recover the transmission and distribution utility's costs, the commission shall correspondingly reduce:

(1)     the competition transition charge, to the extent it has not been securitized;

(2)     the depreciation expense that has been redirected under Section 39.256;

(3)     the transmission and distribution utility's rates; or

(4)     a combination of the elements in Subdivisions (1)-(3).

*Id*. § 39.262(g).

**Proceedings below**

Appellant CenterPoint is the TDU component of the "unbundled" integrated utility formerly known as Reliant Energy, Inc. In the final "true-up" proceeding involving CenterPoint and its generation and retail affiliates—the subject of this Court's recent opinion in *CenterPoint Energy Houston Electric, LLC*, 252 S.W.3d 1—the Commission determined that CenterPoint was entitled to recover a total of approximately $2.3 billion in stranded costs and what the parties term "non-stranded" costs.[5]  *See id.* at 23-24. CenterPoint then filed parallel proceedings to obtain Commission authorization to recover these costs either through securitization[6] or a CTC. The

---

[5] *Application of CenterPoint Energy Houston Electric, LLC, Reliant Energy Retail Services, LLC, and Texas Genco, LP to Determine Stranded Costs and Other True-Up Balances Pursuant to PURA § 39.262*, PUC Docket No. 29526, Order on Rehearing (Dec. 17, 2004), *available at* http://interchange.puc.state.tx.us (accessed July 6, 2008).

[6] *Application of CenterPoint Energy Houston Electric, LLC for a Financing Order*, PUC Docket No. 30485 (March 16, 2005), *available at* http://interchange.puc.state.tx.us (accessed July 6, 2008).

8

Commission permitted CenterPoint to securitize most of its costs but determined that, under the then-applicable version of PURA's securitization provisions, certain of its "non-stranded" costs were not "qualifying costs" that could be securitized. *See* Tex. Util. Code Ann. § 39.302(4) (West 2007).

CenterPoint proceeded to obtain Commission approval to recover approximately $570 million of its "non-stranded" costs not then subject to securitization through a CTC. This amount reflected CenterPoint's capacity auction true-up amount, which was positive; net of its final fuel adjustment, which was negative, *see id.* § 39.262(d); additional downward adjustments for the retail clawback, *id.* § 39.262(e); and a further deduction to the CTC based on accumulated deferred taxes that the Commission had ordered in CenterPoint's earlier securitization case. The calculation also reflected accrued interest on various of these amounts. In other words, the positive net amount that CenterPoint would be collecting through the CTC represented its capacity auction true-up balance and accrued interest.

The Commission's order provided for collection of the CTC from REPs over a fourteen-year period, with mechanisms for periodic adjustments and a final true-up to prevent over-or under-recovery. Three additional features of the order gave rise to the issues now disputed on appeal:

- ***The interest rate***. The Commission concluded that the version of P.U.C. Subst. R. 25.263(*l*)(3) then in effect required it to award CenterPoint interest on the uncollected CTC balance at the rate of 11.075 percent. Appellees Gulf Coast Coalition of Cities (GCCC), Texas Industrial Energy Consumers (TIEC), and the State of Texas (as an electricity consumer) contended the rule had been invalidated in its entirety by the Texas Supreme Court in *CenterPoint Energy, Inc.*, 143 S.W.3d at 84, 99. Commissioner Parsley echoed that view in dissenting from this portion of the order.

9

•   *Valuation panel fee*.  The Commission authorized CenterPoint to recover, through a three-year surcharge included in the CTC, $24 million of rate-case expenses, including $5.2 million in fees charged by J.P. Morgan for its services as the "valuation panel" convened by the Commission in connection with CenterPoint's use of the partial stock valuation method to determine the market value of its transferred generation asserts in its true-up proceeding.[7] *See* Tex. Util. Code Ann. § 39.262(h)(3); *see generally CenterPoint Energy*, 252 S.W.3d at 17-34.[8]  TIEC had argued that the legislature required these fees to be paid by the transferee corporation—CenterPoint's then-affiliated generation company, Texas Genco—rather than REPs and consumers.  *See* Tex. Util. Code Ann. § 39.262(h).

•   *New on-site generators*.  Occidental Power Marketing, L.P., a retail electric provider that serves primarily industrial electric consumers affiliated with it, had complained that the Commission's order would require its customers who switched to their own new on-site electricity generation facilities—thereby reducing or eliminating their demand for power delivered over CenterPoint's system and subject to the CTC—to continue nonetheless paying the delivery-based charge based on their electricity usage from their own facilities.  Although conceding that the legislature has required such treatment to the extent *stranded* costs are being collected through a CTC, *see* Tex. Util. Code Ann. § 39.252(b) (West 2007), Occidental urged that the Commission had no authority to permit CenterPoint to similarly collect *non*-stranded costs from its customers who switched to new on-site generation.  Because CenterPoint's CTC collected exclusively non-stranded costs, Occidental reasoned, the Commission had no authority to impose the charge on those customers.

Following the proceedings before the Commission, GCCC, TIEC, the State, and Occidental each filed administrative appeals in Travis County district court bringing forward the arguments they had asserted before the Commission.  CenterPoint intervened, and the actions were

---

[7]  CenterPoint had incurred the fees in its true-up proceeding, its final fuel reconciliation proceeding, and the proceedings underlying this appeal.  Approximately $5 million of the fees were GCCC expenses that CenterPoint was required to pay under PURA section 33.023.  *See* Tex. Util. Code Ann. § 33.023 (West 2007).

[8]  The rate case expense component of the charges did not accrue interest.

consolidated. GCCC, TIEC, and the State jointly argued that the Commission erred in setting the interest rate on the uncollected balances being collected through the CTC; TIEC challenged the inclusion of the valuation panel fee; and Occidental urged its complaint regarding new on-site generation. The district court sustained all three grounds, holding that "the Commission improperly relie[d] upon PUC Subst. Rule 25.263(*l*)(3) that has been invalidated by the Texas Supreme Court," that the Commission's ruling "that CenterPoint may recover the cost of valuation panel . . . is contrary to the express language of the statute requiring payment of such costs by the transferee corporation," and that "[t]o the extent the CTC approved by the Commission exceeds the statutory definition of 'stranded cost' at PURA § 39.251(7), the Commission order exceeds the authority set out in PURA § 39.252." The district court rendered judgment reversing the Commission's order and remanding for further proceedings consistent with its holdings.

CenterPoint and the Commission filed separate appeals from the district court's judgment.

## ANALYSIS

In their respective appeals, CenterPoint and the Commission each assert three issues corresponding to the grounds on which the district court reversed and remanded the Commission's order. They urge that the district court erred as to each ground, and ask us to reverse the judgment and render judgment affirming the Commission's order.[9]

---

[9] These issues are distinct from those presented in the appeal of the underlying true-up proceeding. *CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d 1. Although the outcome of the true-up litigation may impact the stranded cost and "non-stranded" cost balances that CenterPoint is ultimately entitled to recover through a CTC or otherwise, no party is seeking to eliminate CenterPoint's capacity auction true-up recovery altogether. *See id.* at 160 n.47.

11

**Interest rate**

At the time of the underlying Commission proceedings, rule 25.263(*l*)(3) provided:

> The TDU [transmission and distribution utility] shall be allowed to recover, or shall be liable for, carrying costs on the true-up balance . . . calculated using the utility's cost of capital established in the utility's UCOS [unbundled cost-of-service] proceeding, and shall be calculated for the period of time from the date of the final true-up order until fully recovered.

26 Tex. Reg. 10498 (2001) (codified at 16 Tex. Admin. Code § 25.263(*l*)(3)). The Commission concluded that this rule required it to award CenterPoint interest on its uncollected CTC balance at the rate of 11.075 percent, the rate established in CenterPoint's 2001 UCOS proceeding. In contending otherwise, GCCC, TIEC and the State have urged that in *CenterPoint Energy, Inc. v. Public Utility Commission*, the Texas Supreme Court invalidated rule 25.263(*l*)(3) in its entirety. In that case, the supreme court held that PURA entitled utilities to recover interest on their stranded costs beginning on the first day of competition—not, as rule 25.263(*l*)(3) then provided, only from the date of the utility's final true-up order. *CenterPoint Energy, Inc.*, 143 S.W.3d at 84, 99. The court phrased its holding as "Rule 25.263(*l*)(3) is invalid." *Id.*

---

We also note that CenterPoint, availing itself of 2007 PURA amendments that expanded the range of true-up balances that can be securitized, recently securitized the uncollected balance of the CTC calculated as of February 12, 2008. *Application of CenterPoint Energy Houston Electric, LLC, for Financing Order*, PUC Docket No. 34448, Order (Sept. 18, 2007), Issuance Advisory Letter (Jan. 30, 2008), & Final Accounting of Up-Front Costs (Apr. 11, 2008), *available at* http://interchange.puc.state.tx.us (accessed July 6, 2008). It was contemplated in those proceedings that if the outcome of *CenterPoint Energy Houston Electric, LLC* or other pending appeals resulted in adjustments to the balances that CenterPoint is entitled to recover, such changes would be addressed in subsequent filings. *See* Issuance Advisory Letter (Jan. 30, 2008) at 7.

12

The Commission majority, construing the supreme court's holding as being limited solely to rule 25.263(*l*)(3)'s accrual provisions, concluded that the portions of the rule governing the rate of interest had not been invalidated, were severable, and had remained in effect. Accordingly, it applied CenterPoint's 2001 UCOS cost-of-service rate to determine the interest rate. The parties dispute the proper interpretation of the *CenterPoint Energy, Inc.*, holding and whether the Commission's use of the 11.075 percent interest rate was arbitrary and capricious with or without the rule.[10]

Our disposition of this issue is controlled by our recent decision in *AEP Texas Central Co. v. Public Utility Commission*, No. 03-07-00196-CV, ___ S.W.3d ___, 2008 Tex. App. LEXIS 4823 (Tex. App.—Austin June 18, 2008, no pet. h.) (per curiam) (op. on reh'g); *id.* at *26 (Patterson, J., concurring and dissenting). In *AEP Texas Central*, we held that the supreme court's *CenterPoint Energy, Inc.* decision invalidated only the portion of rule 25.263(*l*)(3) that had governed the interest accrual date, but not the part prescribing the rate, and that the other portions of the rule had remained in effect. The district court erred in concluding otherwise here.

---

[10] GCCC, TIEC and the State term this "[t]he key issue decided in PUC Docket No. 30706."

In July 2006, the Commission amended rule 25.263(*l*)(3) to both conform the interest accrual date to *CenterPoint Energy, Inc.*, and alter the rate methodology. *See* 31 Tex. Reg. 5603 (2006). CenterPoint subsequently filed and obtained Commission approval of a revised tariff complying with the new rule that specified an interest rate on the CTC lower than 11.075%. *CenterPoint Energy Houston Electric, LLC's Tariff Filing in Compliance with P.U.C. Subst. R. 25.263(l)(3)*, PUC Tariff Control No. 32949 (July 17, 2006); *CenterPoint Energy Houston Electric, LLC's Tariff Filing in Compliance with P.U.C. Subst. R. 25.263(l)(3)*, PUC Tariff Control No. 32949, Notice of Approval (July 31, 2006), *available at* http://interchange.puc.state.tx.us (accessed July 6, 2008). Consequently, the parties' dispute regarding the first issues would appear to be limited to interest on the CTC that would have accrued previously.

13

As the rule's rate provision had remained in effect, the Commission did not err or act arbitrarily or capriciously by complying with the mandate of its own rule and awarding CenterPoint 11.075 percent interest on its uncollected CTC balance. *See Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 542 (Tex. App.—Austin 2002, pet. denied) (an agency is bound to comply with its own rules and procedures). We sustain the Commission's first issue and CenterPoint's first issue.

**Valuation panel fee**

In concluding that the Commission had no authority to permit CenterPoint to recover the valuation panel fee through the CTC, the district court relied on the "express language" of PURA section 39.262(h)(3). That provision governs the "partial stock valuation method" for determining the market value of generation assets for purposes of a utility's final stranded cost true-up. That method entails a utility transferring some or all of its generation assets to separate affiliated or nonaffiliated corporations and both corporations "spinning off" a portion of their stock. *See* Tex. Util. Code Ann. § 39.262(h)(3). After the stock has been publicly traded for at least a year, "the resulting average daily closing price of the common stock over 30 consecutive trading days chosen by the commission out of the last 120 consecutive trading days before the [true-up] filing . . . shall be presumed to establish the market value of the common stock equity in each transferee corporation." *See id.* At that juncture, the Commission has the option to either "accept this market valuation to conclusively establish the value of the common stock equity in each transferee corporation or convene a valuation panel of three independent financial experts to determine whether the percentage of common stock sold is fairly representative of the total common

14

stock equity or whether a control premium exists for the retained interest." *Id.* If the Commission

opts for the latter,

> [t]he valuation panel must consist of financial experts, chosen from proposals submitted in response to commission requests, from the top ten nationally recognized investment banks with demonstrated experience in the United States electric industry as indicated by the dollar amount of public offerings of long-term debt and equity of United States investor-owned electric companies over the immediately preceding three years as ranked by the publications "Securities Data" or "Institutional Investor."

*Id.* Then, "[i]f the panel determines that a control premium exists for the retained interest, the panel

shall determine the amount of the control premium, and the commission shall adopt the

determination but may not increase the market value by a control premium greater than 10 percent."

*Id.* "The determination of the commission based on the finding of the panel conclusively establishes

the value of the common stock of each transferee corporation." *Id.* Within the same paragraph,

PURA section 39.262(h)(3) states: "The costs and expenses of the panel, as approved by the

commission, shall be paid by each transferee corporation." *Id.* TIEC argued below, and the district

court agreed, that this sentence unambiguously mandated that Texas Genco—CenterPoint's

then-affiliated power generation company—must alone incur the valuation panel's fee and that the

Commission exceeded its authority in allowing the fee to be shifted through CenterPoint to REPs

and, ultimately, to consumers via the CTC.

In their respective second issues, the Commission and CenterPoint contend that this

sentence of PURA section 39.262(h)(3) governs only who is held responsible in the first instance

for paying for the valuation panel when the Commission decides to convene one. Absent such a

15

provision, they suggest PURA section 39.262(h)(3) would arguably imply that the Commission itself would be required to cover any valuation panel expenses. Appellants emphasize evidence that Texas Genco was, in fact, contractually responsible to pay the valuation panel's fee (though CenterPoint, then its corporate parent, guaranteed the obligation and ultimately paid it). This was all PURA section 39.262(h)(3) required, appellants urge, because the provision does not address, much less limit, how the transferee corporation satisfies its obligation. Nor, appellants further contend, does section 39.262(h)(3) address whether any valuation panel expenses can later be recovered from retail customers as rate case expenses. That issue, appellants contend, is governed solely by PURA section 36.061(b)(2).

PURA section 36.061(b)(2) authorizes the Commission to "allow as a cost or expense" for ratemaking purposes "reasonable costs of participating in a proceeding under this title [PURA] not to exceed the amount approved by the regulatory authority." Tex. Util. Code Ann. § 36.061(b)(2) (West 2007). There is no dispute that the CenterPoint true-up was a "proceeding" for purposes of this provision and that the Commission had authority to approve CenterPoint's recovery of its "reasonable costs" of participating in it. In fact, in connection with the true-up, this proceeding, and other related proceedings, the Commission, while rejecting some expenses, permitted CenterPoint to recover through rates substantial legal fees and expenses (which no party contested), certain non-legal consultant fees, employee expenses related to the company's true-up related proceedings, certain expenses of CenterPoint witnesses and consultants, and "supplies and equipment."

16

TIEC replies that appellants are ignoring the plain language of PURA section 39.262(h)(3), which it views as unequivocally prohibiting such cost-shifting. As for PURA section 36.061(b)(2), TIEC argues that "[t]hese two provisions can be easily reconciled." Specifically, it urges that "[t]he general language of PURA § 36.061(b) allows CenterPoint to recover the expenses associated with its participation in the true-up proceeding from ratepayers," while "[t]he specific language of PURA § 39.262(h) . . . excludes the costs associated with the control premium valuation panel from that recovery," such that the former "cannot reach so far as to allow recovery of the valuation panel's fee because that amount is specifically governed by PURA § 39.262(h)." *See* Tex. Gov't Code Ann. § 311.026(a) (West 2007) ("If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both."); *Daughters of Charity Health Servs. of Waco v. Linnstaedter*, 226 S.W.3d 409, 411 (Tex. 2007). Appellants counter that the two provisions do not conflict (and there is nothing to "harmonize") because they address different subjects—PURA section 39.262(h) addresses who pays the valuation panel's fees in the first instance, while PURA section 36.061(b)(2) addresses the Commission's ability to allow those payment ultimately to be recouped as rate case expenses.

The Commission is a creation of the Legislature and "has no inherent authority." *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001). "A state agency's powers are limited to (1) powers expressly conferred by the Legislature, and (2) 'implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature.'" *Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, ___, 2007 Tex. LEXIS 1096, at *22 (Tex. 2007) (quoting *City Pub. Serv. Bd.*, 53 S.W.3d at 315). But an agency may not, in

17

the guise of "implied powers," "exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes." *City Pub. Serv. Bd.*, 53 S.W.3d at 316. The existence or scope of the Commission's authority to authorize recovery of the valuation panel fee through rates thus turns on statutory construction.

Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981); *University of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356 (Tex. 2004)); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). Our analysis of the statutory text is also informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2) & (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative

history, and "consequences of a particular construction." *Id.* § 311.023(1), (2), (3), (5) (West 2005). We also presume that the legislature acted with knowledge of the background law. *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990).

Further, regarding a statute that an agency is charged with enforcing, we give "serious consideration" to the agency's construction of it, so long as that construction is reasonable and consistent with the statutory language, and this is particularly true when the statute involves complex subject matter within the agency's area of expertise. *See CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 27-28; *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise or deal with a nontechnical question of law.").

Whether the Commission has authority to permit CenterPoint to recover the valuation panel fee through rates turns on the meaning of the word "paid" as used in PURA section 39.262(h)(3)'s requirement that the valuation panel costs "shall be ***paid*** by each transferee corporation." *See* Tex. Util. Code Ann. § 39.262(h)(3) (emphasis added). TIEC views "paid" as mandating that the transferee corporation must be the exclusive ultimate funding source for the valuation panel fee. If that were so, the Commission would lack authority to order otherwise. Appellants view "paid" to mean merely that the transferee corporation (as opposed to the Commission or some other entity) has the immediate responsibility to cover the valuation panel fee, while leaving to other law (including PURA section 36.061(b)(2)) how the transferee corporation ultimately funds that obligation or can be reimbursed for it. This obligation, appellants suggest, is

19

akin to other costs that rate proceeding participants pay out of pocket but routinely recover through rates under PURA section 36.061(b)(2). For several reasons, we conclude that appellants' proposed construction is the one that reflects the legislature's intent.

The legislature did not elaborate in either PURA section 36.061(b)(2) or section 39.262(h)(3) concerning the relationship, if any, it intended or perceived between the two provisions. CenterPoint refers us to numerous statutory examples within PURA where the legislature, when perceiving potential conflicts with other statutes or law, explicitly stated which would control.[11] These examples confirm that when the legislature perceived such conflicts and desired one PURA provision to control over another, it knew how to say so. Absent a contrary indication in the text of either PURA section 36.061(b)(2) or section 39.262(h)(3), we must presume that the legislature intended both statutes to be fully effective. *See* Tex. Gov't Code Ann. § 311.021(2) (we presume that "the entire statute is intended to be effective"); *cf. Texas Lottery Comm'n v. First State Bank of DeQueen*, No. 03-07-00249-CV, ___ S.W.3d ___, 2008 Tex. App. LEXIS 3572 (Tex. App.—Austin 2008, pet. filed) (rejecting claims of statutory "conflict" because one statute explicitly stated that it controlled over conflicting provisions). Accordingly, we are to harmonize potentially conflicting or overlapping statutes when possible. *See* Tex. Gov't Code Ann. § 311.026(a); *see also Lexington Ins. Co.*, 209 S.W.3d at 85 (observing that specific-controls-over-general principal "applies only when overlapping statutes cannot be reconciled," and construing statutes so as to avoid conflict). Appellants' construction is consistent with these principles, and TIEC's is not. TIEC's construction of PURA section 39.262(h)(3) would create a conflict with

---

[11] Tex. Util. Code Ann. §§ 36.007(d), 36.204, 36.351(a), 39.158(d), 39.263(d) (West 2007).

PURA section 36.061(b)(2) to the extent of barring later recovery of valuation panel expenses as rate case expenses. Under appellants' construction of PURA section 39.262(h)(3), by contrast, the two provisions would be entirely harmonious with one another.

PURA section 39.262(h)(3)'s silence regarding any relationship with section 36.061(b)(2) may be especially significant because section 39.262(h)(3) was the later-enacted of the two.[12] When the legislature enacts a statute, we presume that it does so with awareness of the existing body of law. *Acker*, 790 S.W.2d at 301. Yet the legislature gave no express indication in PURA section 39.262(h)(3) about prohibiting application of PURA section 36.061(b)(2)'s preexisting cost-recovery regime to true-up proceedings involving a valuation panel. PURA section 39.262(h)(3) "should be construed in a manner that harmonizes rather than conflicts with that law." *Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 531 (Tex. 2002) (citing *Acker*, 790 S.W.2d at 301 & Tex. Gov't Code Ann. § 311.026(a)).

We conclude that by providing that the transferee corporations "shall pay" valuation panel expenses, the legislature did not intend to preclude those expenses ultimately being recovered through rates under PURA section 36.061(b)(2). The provision, in other words, reflects not a mandate that such expenses be borne exclusively by transferee corporations, as TIEC suggests, but merely an expectation that the expenses would be "paid" by transferee corporations in the same manner that parties to rate proceedings routinely pay legal expenses, consultant fees, and myriad other "costs of participating in a proceeding" that are potentially eligible for later recovery under

---

[12] *See* Act of June 18, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2582; Act of May 21, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 774.

21

PURA section 36.061(b)(2). Consequently, PURA section 39.262(h)(3)'s requirement that valuation panel expenses "shall be paid by the transferee corporation" does not prohibit the Commission from authorizing CenterPoint ultimately to recoup those expenses pursuant to PURA section 36.061(b)(2). We sustain the Commission's second issue and CenterPoint's second issue.

**New on-site generators**

The third issue of both the Commission and CenterPoint concerns the extent of the Commission's authority to require end-use customers who have switched to their own on-site power generation facilities—thereby eliminating or sharply reducing their taking of power delivered over CenterPoint's system—to nonetheless continue paying delivery-based charges like the CTC based on their use of power they generate themselves. As noted, a CTC or TC is a nonbypassable delivery charge—a utility bills an REP based on its delivery of power to the REP's end-use customer, and the REP, in turn, must pass on the charge to the customer who incurred it. Thus, as CenterPoint acknowledges, "an end-use customer can theoretically avoid the nonbypassable charges altogether by ceasing to take delivery of power from the TDU." If customers began ceasing to take delivery of power from the TDU so as to avoid delivery charges, one consequence, all other things being equal, would be that remaining TDU customers would bear increasingly greater proportions of the costs being recovered through the charges. The legislature responded to these possibilities by enacting PURA section 39.252(b):

> Recovery of retail stranded costs by an electric utility shall be from all existing or future retail customers, including the facilities, premises, and loads of those retail customers, within the utility's geographical certificated service area as it existed on May 1, 1999. A retail customer may not avoid stranded cost recovery charges by switching to new on-site generation except as provided by Section 39.262(k).

22

Tex. Util. Code Ann. § 39.252(b)(1). The legislature additionally created a means for utilities to impose a CTC or TC on customers who had greatly reduced the amount of power they were taking off the utilities' systems by switching to new on-site generation:

> If a customer commences taking energy from new on-site generation which materially reduces the customer's use of energy delivered through the utility's facilities, the customer shall pay an amount each month computed by multiplying the output of the on-site generation by the new sum of competition transition charges under Section 39.201 and transition charges under Subchapter G [securitization] which are in effect during that month. Payment shall be made to the utility, its successors, an assignee, or other collection agent responsible for collecting the competition transition charges and transition charges and shall be collected in addition to the competition transition charges and transition charges applicable to energy actually delivered to the customer through the utility's facilities.

*Id.* § 39.252(b)(2). The legislature excluded from these requirements on-site generation facilities with capacity of ten megawatts or less ("small self-generators")[13] and certain "grandfathered" "qualifying facilities."[14] In turn, the "Section 39.262(k)" referenced in PURA section 39.252(b) provides that small self-generators and customers with grandfathered generation facilities are

---

[13] Section 39.252(b)(1) defines "new on-site generation" as "electric generation capacity greater than 10 megawatts capable of being lawfully delivered to the site without use of utility distribution or transmission facilities." *Id.* § 39.252(b)(1).

[14] Section 39.252(b)(1) applies only to "new on-site generation" (i.e., that having capacity greater than 10 megawatts) "which was not, on or before December 31, 1999, either: (A) a fully operational facility; or (B) a project supported by substantially complete filings for all necessary site-specific environmental permits under the rules of the Texas Natural Resource Conservation Commission in effect at the time of filing." *Id.*

responsible for stranded-cost recovery only to the extent of services actually provided by the utility.[15]

Tex. Util. Code Ann. § 39.262(k) (West 2007).

PURA section 39.252(b) thus manifests legislative intent to prevent end-use customers capable of installing their own large generation facilities—typically major industrial customers—from "avoid[ing] stranded cost recovery charges by switching to new on-site generation" and leaving remaining customers to pay what otherwise would have been the new on-site generators' "share." CenterPoint also refers to a portion of the legislative history of PURA section 39.252(b) that is consistent with that observation. During the House floor debate on the legislation that became PURA chapter 39, Representative Sylvester Turner sponsored the amendment that ultimately became section 39.252(b).[16] Representative Turner explained that amendment's purpose was to "keep everyone in the pool" of customers required to pay stranded costs by closing a "loophole"

---

[15] Section 39.262(k) provides:

Notwithstanding Section 39.252, to the extent that a customer's actual load has been lawfully served by a fully operational qualifying facility before September 1, 2001, or by an on-site power production facility with a rated capacity of 10 megawatts or less, any charge for recovery of stranded costs under this section or Subchapter G [securitization] assessed on that customer after the facility becomes fully operational shall be included only in those tariffs or charges associated with the services actually provided by the transmission and distribution utility, if any, to the customer after the facility became fully operational and may not include any costs associated with the service provided to the customer by the electric utility or its affiliated transmission and distribution utility under their tariffs before the operation of that qualifying facility. To qualify under this subsection, a qualifying facility must have made substantially complete filings on or before December 31, 1999, for all necessary site-specific environmental permits under the rules of the Texas Natural Resource Conservation Commission in effect at the time of filing.

*Id.* § 39.262(k).

[16] *See* Debate on Tex. S.B. 7 on the Floor of the House, 76th Leg., R.S., at 15, 18 (May 20, 1999).

24

through which "very large, large companies who can decide to self generate . . . can get out of paying their portion of stranded costs."[17] Representative Turner expressed concern that if these types of customers departed "the pool," it would cause "a disproportionate amount [to be] placed on everyone else that remains in the pool."[18] Representative Turner also emphasized that stranded costs represented investments that utilities had previously made to build facilities to serve all customers, including those who might later switch to self-generation, as the utilities had been required to do under regulation.

PURA section 39.252(b), as Occidental acknowledges, "requires new on-site generation users to pay a utility's 'stranded costs' even with respect to service they are not receiving." Occidental concedes that, for example, its customers must continue to pay CenterPoint's TC used to recover stranded costs, even if they switch to new on-site generation, with the TC for any new on-site generators being calculated under the methodology of section 39.252(b)(2). The parties' dispute, rather, centers on whether section 39.252(b) authorizes the Commission similarly to require new on-site generators to pay a utility's "*non*-stranded" costs—specifically, the capacity auction true-up balance recovered through CenterPoint's CTC. Because that was the sole component of CenterPoint's CTC, the outcome of this issue controls whether Occidental's customers could be required to pay the CTC at all.

Occidental prevailed in the district court by arguing that PURA section 39.252(b) manifests legislative intent that new on-site generators could be required to pay *only* stranded costs based on their own on-site generation, but could not also be required to pay non-stranded costs on

[17] *Id.* at 15.

[18] *Id.*

25

that basis. Occidental observes that section 39.252(b) refers solely to "stranded costs" and makes no express mention of capacity auction true-up balances or other "non-stranded" costs. *Id.* § 39.252(b) ("***Recovery of retail stranded costs*** by an electric utility shall be from all existing or future retail customers . . .," and "[a] retail customer may not avoid ***stranded cost recovery charges*** by switching to new on-site generation . . . .") (emphases added). Invoking the statutory-construction principle of *expressio unis est exclusio alterius*—the mention of one thing impliedly excludes other things of the same type—Occidental maintains that the legislature's express references in section 39.252(b) to "stranded cost" recovery implies its intent to exclude non-stranded costs, thereby leaving undisturbed the status quo that customers who did not take power delivered over a utility's system were not obligated to pay delivery-based charges. *See, e.g.*, *Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 401-02 (Tex. 2000).

In contending that the district court erred, the Commission and CenterPoint advance somewhat different arguments. The Commission insists that Occidental's construction of PURA section 39.252(b) ignores the provision's context within PURA chapter 39. The Commission points to section 39.201, which, as previously discussed, contemplates the initial imposition of a CTC based on projected stranded costs identified in the 2001 ECOM estimates, and section 39.262(g), which contemplates adjustments to the CTC based on both stranded-cost and "non-stranded" cost calculations made in the final true-up. *See* Tex. Util. Code Ann. §§ 39.201, 39.262(g). The Commission argues that (1) section 39.252(b) required that an initial CTC (which would have recovered exclusively projected stranded costs[19]) would be imposed on new on-site generators; and (2) there is no indication in PURA that the legislature contemplated

---

[19] *See* Tex. Util. Code Ann. § 39.201.

26

"two separate CTCs"—"one paid by new on-site generators and another paid by everyone else"—following the final true-up. Thus, the Commission reasons, the legislature must have intended that new on-site generators pay the CTC, as adjusted (or imposed) after the final true-up, even if the charge recovered some non-stranded cost balances. "At most," the Commission suggests that "the statute is ambiguous" and that we should defer to its "reasonable interpretation" of it. *See State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex. 1994).

CenterPoint, by contrast, concedes that PURA section 39.252(b) "is limited to only stranded costs," but disputes that the omission reflects legislative intent that the Commission be prohibited from imposing non-stranded cost charges on new self-generators. CenterPoint observes that the *expressio unis est exclusio alterius* principle is not an inflexible rule, but merely a tool for ascertaining legislative intent. *See Mid-Century Ins. Co. v. Kidd*, 997 S.W.2d 265, 274 (Tex. 1999) ("The doctrine . . . is simply an aid to determine legislative intent, not an absolute rule [and] . . . should not be mechanically applied to compel an unreasonable interpretation."). CenterPoint suggests that a more reliable indicator of legislative intent is the legislative history noted above, which it views as evidencing general legislative concern with the prospect of large industrial companies avoiding their "fair share" of costs associated with Texas's transition to a competitive retail electric marker by switching to self-generation, thereby increasing the relative burdens on the customers who remained. On the other hand, as CenterPoint admits, "the debate surrounding the amendment was about stranded costs," and that *non*-stranded costs are not explicitly mentioned. Nonetheless, CenterPoint maintains that "it is impossible to read the legislative history and conclude that, by adopting the amendment, the Legislature made a 'decision' to allow large self generators to avoid non-stranded costs." Because PURA section 39.252(b), in its view, does not prohibit the

Commission from requiring new self-generators to pay non-stranded costs, CenterPoint urges that the Commission's authority to do so is implicit (if not explicit) in PURA section 39.262(g)'s requirement that "the transmission and distribution utility shall make necessary adjustments to the nonbypassable delivery rates it charges to retail electric providers" based on both stranded costs and non-stranded cost true-up balances. *See* Tex. Util. Code Ann. § 39.262(g).

We have previously identified the principles that govern our analysis of the Commission's statutory authority here. We begin with PURA section 39.262(g), the provision that is the basis for the Commission's authority to adjust a utility's nonbypassable delivery rates based on "non-stranded" cost true-up balances. Section 39.262(g) does not address whether or how such balances could be charged to new on-site generators and, standing alone, the provision may imply that such charges might not be authorized. *See id.* Section 39.262(g) states only that the utility "shall make necessary adjustments to the nonbypassable delivery rates it charges to retail electric providers" based on the capacity auction true-up balance, final fuel factor, retail clawback, and regulatory asset adjustments required under section 39.262(f). *See id.* The sole indication in the provision regarding what end-use customers will ultimately absorb in the charge is the term "nonbypassable delivery rates." Nonbypassable *delivery* rates, as noted, refer in PURA to charges based on the *delivery* of electricity over a utility's system. As CenterPoint acknowledges, if a customer is not having power delivered over its system, the customer would not, all other things being equal, pay delivery-based charges like CenterPoint's CTC. In this respect, a CTC is akin to transportation costs reflected in retail grocery prices that a consumer might avoid by growing his or her own produce or simply deciding not to buy groceries. We presume that the legislature understood this implication of requiring a delivery-based charge, *see Acker*, 790 S.W.2d at 301

28

(we presume the legislature is aware of the background law when enacting a statute), and it clearly manifested that understanding through its enactment of PURA section 39.252(b).

Only in PURA section 39.252(b) did the legislature address the extent to which new on-site generators could be required to pay a CTC. The provision states that "[r]ecovery of retail stranded costs by an electric utility shall be from all existing or future retail customers" and that new on-site generators cannot "avoid stranded cost recovery charges by switching to new on-site generation." Tex. Util. Code Ann. § 39.252(b)(1). Occidental urges that by referring to "stranded costs" and not such terms as "capacity auction true-up balances" or "non-stranded costs," the legislature manifested its intent to bar the Commission from authorizing recovery of capacity auction true-up balances from new on-site generators. It is true, as Occidental urges, that the term "stranded costs" has a well-established technical meaning within PURA, as previously discussed. Where statutory terms have acquired a technical meaning, we are to give effect to that meaning, *see* Tex. Gov't Code Ann. § 311.011(b), and we are likewise to "read every word, phrase, and expression in a statute as if it were deliberately chosen and presume the words excluded from a statute are done so purposefully." *Cities of Corpus Christi*, 188 S.W.3d at 690. Applying these principles to the text of section 39.252(b), however, they do not necessarily support Occidental's proposed construction.

The operative phrases in PURA section 39.252(b) are that "*[r]ecovery of retail stranded costs* by an electric utility shall be from all existing or future retail customers" and that new on-site generators cannot "*avoid stranded cost recovery charges* by switching to new on-site generation." Tex. Util. Code Ann. § 39.252(b)(1) (emphases added). We must construe these phrases in their context within PURA chapter 39, not in isolation. *See Gonzalez*, 82 S.W.3d at 327. Viewed in that context, "recovery of retail stranded costs" and "stranded cost recovery charges"

29

could reasonably refer not only to the recovery of stranded costs, per se, but also to the mechanisms or charges that the legislature has provided for the "recovery of retail stranded costs"—the TC and CTC. As the Commission observes, the legislature in PURA section 39.262(g) contemplated that a CTC could be adjusted (or imposed for the first time) following a utility's final true-up to collect costs that could include both stranded cost and "non-stranded cost" true-up balances. *See* Tex. Util. Code Ann. § 39.262(g). If section 39.252(b) actually requires that any positive adjustment based on "non-stranded" costs reflected in the CTC not be charged to new on-site generators based on their on-site generation, the result, as the Commission argues, would be a bifurcated CTC, and there is no indication in PURA chapter 39 that the legislature contemplated such a thing. This statutory structure suggests that when the legislature made new on-site generators responsible for "stranded cost recovery charges" in PURA section 39.252(b), it was contemplating the *CTC*, including any "non-stranded" cost adjustments or components required under section 39.262(g), rather than strictly limiting the charges imposed solely to stranded cost balances. *Id.* §§ 39.252(b), .262(g).

We also observe that in PURA chapter 39, the line between stranded costs and what the parties term "non-stranded" costs is less clear-cut than Occidental assumes, at least with regard to capacity auction true-up balances. As previously noted, the capacity auction true-up balance is essentially a reconciliation of the margins the 2001 ECOM calculations projected a utility would obtain on its power sales during 2002 and 2003 and its actual margins in light of the market valuation of its power yielded by the capacity auction process. *See CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 49-50. The existence and size of such margins is closely related to the calculation of stranded costs, as stranded costs are a function of a utility's ability to recover the costs

30

of its prior investments in generating assets through its electricity sales in a competitive market. *Cities of Corpus Christi*, 188 S.W.3d at 685. In other words, the capacity auction true-up calculation concerns the existence and size of a margin that would be available to reduce stranded costs. *CenterPoint Energy, Inc.*, 143 S.W.3d at 98-99. One implication of this relationship, as both the Texas Supreme Court and this Court have recognized, is that the margin from the capacity auction true-up "may contain a component that allows a return of or on stranded costs." *Id.*; *CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 63-66. In *CenterPoint Energy Houston Electric, LLC*, in fact, this Court upheld the Commission's reduction of CenterPoint's stranded cost true-up award based on a determination that its capacity auction true-up had included a partial recovery of stranded costs. *See CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 63-66.

In advocating a rigid distinction between stranded costs and the capacity auction true-up balance, Occidental emphasizes language in this Court's opinion in *Reliant Energy, Inc. Reliant* involved several challenges to the Commission's initial rule governing the final true-up process. One of the issues concerned a rule provision that would have required utilities to "net" any stranded cost calculations that were negative against any of the "non-stranded" cost balances that were positive. *See Reliant Energy, Inc.*, 101 S.W.3d at 138-41. This Court invalidated the rule, reasoning that "[u]nder chapter thirty-nine, there is simply no concept of negative stranded costs and no consequence of a negative calculation"; thus, there could be a negative stranded cost figure to offset positive other true-up balances against. *Id.* at 139. The Court rejected an argument by the Commission that the balances could be netted because the other true-up balances also represented stranded costs. *Id.* at 139-41. In support, the Court chiefly emphasized distinctions between stranded costs and the final fuel adjustment. *Id.* at 139-40. Although it acknowledged the existence

of "a closer nexus" between the capacity auction balance and "the final determination of stranded costs," the Court concluded that the capacity auction balance was nonetheless not a stranded cost. *Id.* at 140-41. In the context of this discussion, the Court posited that "[c]hapter thirty-nine seems to contemplate two parallel true-up tracks—one for stranded costs and one for the several other true-up items." *Id.* at 141. Subsequently, however, the supreme court in *CenterPoint Energy, Inc.*, and this Court in *CenterPoint Energy Houston Electric, LLC*, have distinguished *Reliant* in acknowledging that even if capacity auction balances are not, strictly speaking, "stranded costs" under PURA chapter 39, they are nonetheless integrally related to the calculation of stranded costs. *CenterPoint Energy, Inc.*, 143 S.W.3d at 98-99 ("That determination [in *Reliant*] does not foreclose the Commission from taking into account any return of or on stranded costs that the margin from the capacity auction true-up contains . . . ."); *CenterPoint Energy Houston Elec., LLC*, 252 S.W.3d at 66 ("In reaching our decision in *Reliant* . . . we made no determination regarding whether it was possible that a utility might recover some of its stranded costs through one or more of the other non-stranded cost true-ups . . . .").

Given this close relationship between the capacity auction true-up and stranded cost recovery, we cannot conclude that the legislature, by providing that "[a] retail customer may not avoid ***stranded cost recovery charges*** by switching to new on-site generation," intended to forbid the Commission from requiring new on-site generators to pay a CTC that recovers a positive capacity auction true-up balance. To the contrary, given the statutory mechanisms that the legislature prescribed for achieving stranded cost recovery, it most likely intended that new on-site generators would be responsible for paying the CTC, including any positive capacity auction component of the charge. Construing these provisions in context, as we must, *see Gonzalez*, 82 S.W.3d at 327,

we cannot conclude that the Commission's construction of its statutory powers was inconsistent with the statutory language or unreasonable.  *See CenterPoint Energy Houston Elec, LLC*, 252 S.W.3d at 27-28.  We accordingly sustain the third issues of the Commission and CenterPoint.

## CONCLUSION

We reverse the district court's judgment and render judgment affirming the Commission's order.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Reversed and Rendered

Filed:   July 25, 2008