TEXAS INDUSTRIAL ENERGY
CONSUMERS, Petitioner,

v.

CENTERPOINT ENERGY HOUSTON
ELECTRIC, LLC, and Public Utility
Commission of Texas, Respondents.

No. 08–0727.

Supreme Court of Texas.

Argued Oct. 6, 2009.

Decided Oct. 22, 2010.

Rehearing Denied Dec. 3, 2010.

Jonathan Day, Lino Mendiola, Caren Elizabeth Pinzur, Meghan E. Griffiths, Andrews Kurth LLP, Austin TX, for Texas Industrial Energy Consumers.

Thomas Lane Brocato, Lloyd Gosselink Rochelle & Townsend, P.C., Austin TX, for Gulf Coast Coalition of Cities.

Scott E. Rozzell, CenterPoint Energy Inc., Houston TX, Robert J. Hearon Jr., Ron H. Moss, Graves Doughery Hearon & Moody, PC, Austin TX, Harris S. Leven, CenterPoint Energy Inc., Associate General Counsel, Houston TX, for CenterPoint Energy Houston Electric LLC.

Richard P. Noland, James M. Bushee, Sutherland Asbill & Brennan LLP, Austin TX, for Occidental Power Marketing, L.P.

Bryan L. Baker, Office of the Attorney General, Amalija 'Amy' J. Hodgins, Austin TX, for State of Texas.

Suzanne Antley, Assistant Attorney General, Brian Alan Prestwood, Assistant Attorney General, Attorney General Greg W. Abbott, Attorney General of Texas, Clarence Andrew Weber, First Assistant Attorney General, David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General, Barbara Bryant Deane, Assistant Attorney General, David Preister, Office of the Attorney General, Elizabeth R.B. Sterling, Envtl. Prot. & Admin. Law Div., Office of the Attorney General, Austin TX, for Public Utility Commission of Texas.

Justice WILLETT delivered the opinion of the Court.

This appeal concerns a Public Utility Commission order setting a "competition transition charge" under Chapter 39 of the Utilities Code. The order followed a true-up proceeding initiated by Center-Point Energy Houston Electric, LLC to recover from ratepayers its investments "stranded" by Texas's transition to a less regulated, more competitive retail electricity market. Groups representing electricity consumers challenged the order, contesting CenterPoint's (1) recovery of interest,[1] and (2) recovery of costs of a valuation panel. The court of appeals affirmed the PUC's order in favor of CenterPoint. We affirm the court of appeals' judgment.

## I. Background

### A. Overview of Relevant Provisions of Chapter 39

The Legislature in 1999 overhauled the Public Utility Regulatory Act (PURA or Act) to create a "fully competitive electric power industry" in Texas.[2] As part of this restructuring, utilities were required, not later than January 1, 2002, to split into three distinct units: (1) a power-generation company, (2) a retail electric provider, and (3) a transmission and distribution utility.[3] After that date, known as the date of consumer choice, retail consumers could choose among competing retail providers.[4]

As for the transmission and distribution utility, its rates continue to be regulated by the PUC.[5] This unit also continues to

---

1. We use "interest" and "carrying costs" interchangeably and intend no distinction between them.

2. TEX. UTIL.CODE § 39.001(a). *See also City of Corpus Christi v. Pub. Util. Comm'n*, 51 S.W.3d 231, 237 (Tex.2001).

3. TEX. UTIL.CODE § 39.051(b).

4. *Id.* § 39.102(a).

5. *See id.* §§ 39.201–.205; *In re TXU Elec. Co.*, 67 S.W.3d 130, 132 (Tex.2001) (Phillips, C.J., concurring) ("Because the generating companies and retail electric providers must use the existing power lines to move electricity from the plant to the retail customer's home or

provide metering services [6] and to charge retail electric providers for "nonbypassable delivery charges" under rates approved by the Commission.[7] The transmission and distribution utility may also, at the retail provider's request, bill retail customers directly.[8]

### 1. Stranded Costs

The Legislature recognized that utilities had made investments in power-generation assets that produced a reasonable return under the existing regulated environment "but might well become uneconomic and thus unrecoverable in a competitive, deregulated electric power market." [9] The Act thus allows utilities to recover these "stranded costs," which consist generally of "the portion of the book value of a utility's generation assets that is projected to be unrecovered through rates that are based on market prices." [10]

The Act deregulated the market in phases. Retail rates were frozen from September 1, 1999 until January 1, 2002.[11]

PURA Section 39.201 directed transmission and distribution utilities to file, on or before April 1, 2000, proposed tariffs that included nonbypassable delivery charges to retail electric providers.[12] It also directed the PUC to approve rates as of January 1, 2002.[13] The nonbypassable delivery charges included a "competition transition charge" (CTC) based on an estimate of stranded costs projected to exist at the end of the freeze period on December 31, 2001.[14] The CTC is "nonbypassable" in "that with limited exceptions, all retail electric customers in an existing utility's service area will pay charges to allow that utility to recover stranded costs regardless of whether those customers purchase their electricity from that utility, switch to one of its competitors, or generate their own electricity." [15] In estimating stranded costs, utilities were required to use the "ECOM" model,[16] an estimation model earlier used in a 1998 PUC report to the Texas Senate.[17] Section 39.201 allowed a utility to recover estimated stranded costs at any time after the start of the freeze period on September 1, 1999, by issuing bonds and using a "transition charge" (TC) to service the bonds, a process known as "securitization" or "securitization financing," [18] or by imposing a CTC.[19] But no such charges were imposed because the PUC concluded that under the ECOM model no utility would incur stranded costs.[20]

---

business, the transmission and delivery companies will remain regulated monopolies.").

**6.** Tex. Util.Code § 39.107(a).

**7.** *Id.* § 39.107(d).

**8.** *Id.* § 39.107(e).

**9.** *CenterPoint Energy, Inc. v. Pub. Util. Comm'n,* 143 S.W.3d 81, 82 (Tex.2004).

**10.** *City of Corpus Christi,* 51 S.W.3d at 237–38; *see also* Tex. Util.Code §§ 39.001(b)(2), .251(7), .252(a).

**11.** Tex. Util.Code § 39.052.

**12.** *Id.* § 39.201(a)-(b).

**13.** *Id.* § 39.201(d).

**14.** *Id.* § 39.201(b), (d), (g).

**15.** *City of Corpus Christi,* 51 S.W.3d at 238 (citing Tex. Util.Code § 39.252).

**16.** Tex. Util.Code § 39.201(h).

**17.** *See id.* § 39.262(i). "ECOM" stands for excess costs over market, *see id.* § 39.254, and is another term for stranded costs.

**18.** *See* Tex. Util.Code §§ 39.201(i), .301.

**19.** *Id.* § 39.201(i).

**20.** *CenterPoint Energy,* 143 S.W.3d at 91.

Under Section 39.262, utilities were required, after January 10, 2004, to file with the PUC a reconciliation of stranded costs and the previous estimate of stranded costs that had been used in determining rates under Section 39.201.[21] By this time, the utility had been unbundled into a transmission and distribution utility, a generating company, and a retail electric provider. Section 39.262 further directed the PUC to conduct a "true-up proceeding" and enter a final order adjusting the CTC to reflect the ultimate valuation of stranded costs.[22] "If, based on the proceeding, the competition transition charge is not sufficient, the commission may extend the collection period for the charge or, if necessary, increase the charge."[23] The adjusted CTC is applied to the nonbypassable delivery rates of the transmission and distribution utility.[24]

For purposes of finalizing the measure of stranded costs, a power-generation company must quantify its stranded costs using "one or more" of four valuation methods specified in the Act: (1) the sale of assets method, (2) the stock valuation method, (3) the partial stock valuation (PSV) method, and (4) the exchange of assets method.[25] If the PSV method is used, the PUC may convene "a valuation panel of three independent financial experts to determine whether the percentage of common stock sold is fairly representative of the total common stock equity or

whether a control premium exists for the retained interest."[26]

## 2. Non–Stranded Cost Adjustments at the True–Up Proceeding

In addition to adjustments for stranded costs, the PUC is directed at the true-up proceeding to make other adjustments to the nonbypassable delivery charges of the transmission and distribution utility. These adjustments are made to what are sometimes labeled non-stranded costs, and can result in an increase or decrease in the amount of or collection period of the CTC.[27]

From January 1, 2002, until January 1, 2007, affiliated retail electric providers were required to charge rates six percent below average rates that were in effect on January 1, 1999, subject to certain adjustments including a fuel factor.[28] This price is known as the "price to beat." After January 1, 2002, each affiliated power-generation company is required to file a final fuel reconciliation that calculates a final fuel balance as of December 31, 2001.[29]

To foster competition, each utility or its unbundled power-generation company was required, at least 60 days before January 1, 2002, to conduct a "capacity auction" that sold entitlements to at least 15 percent of the utility's generation capacity.[30] The obligation continued until the earlier of 60 months after the date customer choice is introduced or the date the PUC

21. TEX. UTIL.CODE § 39.262(c).

22. *Id.* §§ 39.201(*l* ), .262(c).

23. *Id.* § 39.201(*l* ).

24. *Id.* §§ 39.201(*l* ), .262(c). Alternatively, stranded costs may be securitized, as discussed below.

25. *Id.* § 39.262(h)(1)-(4). These methods apply except for the valuation of stranded costs

for certain nuclear assets. *See id.* § 39.262(h)-(i).

26. *Id.* § 39.262(h)(3).

27. *See id.* § 39.262(g).

28. *Id.* § 39.202(a).

29. *Id.* § 39.202(c).

30. *Id.* § 39.153(a).

determined "that 40 percent or more of the electric power consumed by residential and small commercial customers within the affiliated transmission and distribution utility's certificated service area before the onset of customer choice is provided by nonaffiliated retail electric providers." [31]

Under Section 39.262(d), the Act directs the affiliated power-generation company at the true-up proceeding to reconcile and either bill or credit the transmission and distribution utility for the net sum of (1) the former integrated utility's final fuel balance,[32] and (2) the capacity auction true-up balance, which consists of the difference between the price of power realized at the capacity auctions and the power-cost projections used in the ECOM model.[33]

Section 39.262(e) directs the affiliated retail electric provider at the true-up proceeding to credit the affiliated transmission and distribution utility for "any positive difference between the price to beat established under Section 39.202, reduced by the nonbypassable delivery charge established under Section 39.201, and the prevailing market price of electricity during the same time period." [34] This credit is known as the "retail clawback."

Section 39.262(f) directs the PUC at the true-up proceeding to modify the transmission and distribution utility's nonbypassable rates to reflect adjustment to the amount of "regulatory assets," a special

category of assets [35] we have described as "essentially bookkeeping entries." [36]

## B. Proceedings Below

Pursuant to Chapter 39, Reliant Energy, Inc., an integrated electric utility, separated into three entities:

- *CenterPoint Energy Houston Electric, LLC*—the transmission and distribution utility,
- *Reliant Energy Retail Services, LLC*—the retail electric provider, and
- *Texas Genco, LP*—the power-generation company.

These entities filed an application with the PUC to determine stranded costs and other true-up balances pursuant to Section 39.262. In this proceeding (the true-up proceeding), the PUC determined that CenterPoint was entitled to recover approximately $2.3 billion in stranded costs and other non-stranded costs. CenterPoint then initiated parallel proceedings to recover these costs either through securitization or a CTC.

The PUC approves securitization financing with a financing order.[37] CenterPoint filed an application for a financing order, and in that proceeding the PUC issued an order in 2005 allowing CenterPoint to securitize most of the previously determined costs, including stranded costs, carrying costs on the stranded costs, and certain regulatory assets, but held that certain non-stranded costs were not "qualified

---

31. *Id.* § 39.153(b).

32. *Id.* §§ 39.202(c), .262(d)(1).

33. *Id.* § 39.262(d)(2).

34. *Id.* § 39.262(e). This credit is subject to a cap. *Id.*

35. The Act defines regulatory assets as "the generation-related portion of the Texas jurisdictional portion of the amount reported by the electric utility in its 1998 annual report on

Securities and Exchange Commission Form 10–K as regulatory assets and liabilities, offset by the applicable portion of generation-related investment tax credits permitted under the Internal Revenue Code of 1986." *Id.* § 39.302(5).

36. *CenterPoint Energy*, 143 S.W.3d at 85.

37. TEX. UTIL.CODE § 39.303.

costs" [38] that could be securitized.

In the separate CTC proceeding under review in today's case, CenterPoint sought a CTC that would cover the costs it was not allowed to securitize. In July 2005, the PUC issued an order (the Order) determining that CenterPoint could recover approximately $570 million in non-stranded costs through a CTC, to be imposed over a 14–year period. [39] This amount consisted of a positive capacity auction true-up amount, net of a negative final fuel adjustment, a downward adjustment for the retail clawback, and an additional downward adjustment to reflect the retention of deferred federal income taxes. The final CTC amount included accrued interest on the true-up balance. The Order further allows CenterPoint to receive interest on the unrecovered CTC balance over the 14–year recovery period. One commissioner dissented from the part of the Order allowing CenterPoint to recover interest on the true-up balance under PUC Rule 25.263($l$)(3), discussed below.

The PUC also allowed CenterPoint to recover certain rate-case expenses, including a roughly $5.2 million fee charged by J.P. Morgan Securities Inc. and its law firm. This fee pertained to services by three J.P. Morgan bankers as the valuation panel convened by the PUC under Section 39.262(h)(3), after Texas Genco elected to rely on the PSV method to value its generating assets.

Two consumers groups, Texas Industrial Energy Consumers (TIEC) and Gulf Coast Coalition of Cities (GCCC), intervened in the CTC proceeding. Both challenged CenterPoint's recovery of interest, and TIEC additionally challenged CenterPoint's recovery of the valuation-panel fee. They appealed the Order to state district court. [40] The trial court agreed with the consumer groups that CenterPoint could not recover interest on the CTC balance from ratepayers because this Court had invalidated the PUC rule allowing such recovery in *CenterPoint Energy, Inc. v. Public Utility Commission.* [41] The trial court further held that CenterPoint could not recover the valuation-panel fee.

The court of appeals reversed the trial court's judgment and rendered judgment affirming the PUC's Order. [42]

## II. Discussion

### A. Interest on the CTC True–Up Balance

The PUC allowed CenterPoint to recover interest on the CTC balance under its Rule 25.263($l$)(3), which at the time provided:

> The TDU [transportation and distribution utility] shall be allowed to recover, or shall be liable for, carrying costs on the true-up balance. Carrying costs shall be calculated using the utility's cost of capital established in the utility's UCOS [unbundled cost-of-service] proceeding, and shall be calculated for the

---

**38.** *See id.* § 39.302(4). Various sections of Chapter 39 were amended in 2007 to expand the categories of costs that can be securitized. Act of May 28, 2007, 80th Leg., R.S., ch. 1186, 2007 Tex. Gen. Laws 4049. The CTC at issue in this case was eventually securitized, after the PUC order and the interest-rate period at issue in this appeal.

**39.** *Application of Centerpoint Energy Houston Electric, LLC for a Competition Transition Charge,* PUC Docket No. 30706, 2005 WL 1668034 (July 14, 2005) (Order), *available at* http://interchange.puc.state.tx.us.

**40.** *See* Tex. Util. Code § 15.001.

**41.** 143 S.W.3d 81 (Tex.2004).

**42.** 263 S.W.3d 448, 468.

period of time from the date of the true-up order until fully recovered.

The consumer groups argue that interest on the true-up balance is not allowed because we invalidated Rule 25.263(*l*)(3) in its entirety in *CenterPoint Energy*. The PUC and CenterPoint argue that we only invalidated the *timing* portion of the Rule—the date that interest begins to accrue. We agree with the PUC and CenterPoint. Any fair reading of our *Center-Point Energy* decision makes clear we were focused on the date, not the rate.

We stated in *CenterPoint Energy* that "Rule 25.263(*l*)(3) is invalid," [43] and we reasonably read that statement in context.[44] We explained:

> No one disputes that the Legislature intended electric utilities to recover carrying costs on stranded costs to compensate for the financing costs incurred during the stranded cost recovery period. Nor does anyone dispute that prior to deregulation, carrying costs on investments in generation plants were included in rates. The only issue before us is the date from which carrying costs may be recovered once deregulation commenced: January 1, 2002, which was the first day of deregulation, or two or more years later, at the end of final true-up proceedings.[45]

We did not hold utilities cannot recover interest on their stranded costs or other costs. Indeed, we held that the rule was too parsimonious because it did not provide for the recovery of interest for the period between January 1, 2002, the date consumer choice commenced, and the date of the final true-up order. The basis of our holding was that failure to allow the recovery of interest during this period would fail to compensate the utilities fully for their stranded costs that existed on December 31, 2001, the last day of the freeze period.[46] "A two- or three-year gap in recovery of carrying costs would not permit generation companies full recovery of their stranded costs as the Legislature intended." [47] We further noted that in allowing securitization to reduce stranded costs, the Act specifically states that the purpose of securitization is to enable utilities to use this financing technique "to recover regulatory assets and stranded costs, because this type of debt will lower the carrying costs of the assets." [48]

We invalidated Rule 25.263(*l*)(3) only insofar as it picked the wrong start date for the accrual of carrying costs:

> We conclude that the Commission's construction of chapter 39 was incorrect regarding the *date* as of which stranded costs are to be determined.... Because the Commission's rule is based on an incorrect construction of the Act *in this regard*, it is infirm.[49]

---

**43.** 143 S.W.3d at 84, 99.

**44.** *See Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750, 753 (Tex.1993) ("The Court's language must be read in the context of the issues decided.").

**45.** *CenterPoint Energy*, 143 S.W.3d at 83. *See also id.* at 86 ("The only issue is whether the Act contemplates roughly a two-year gap in recovery of carrying costs between the date regulation ceased (January 1, 2002) and the date of a final true-up order (2004 or perhaps beyond).").

**46.** *Id.* at 84 (citing Tex. Util.Code §§ 39.252(a), .201(g)).

**47.** *Id.*

**48.** Tex. Util.Code § 39.301, quoted in *CenterPoint Energy*, 143 S.W.3d at 89.

**49.** *CenterPoint Energy*, 143 S.W.3d at 87 (emphasis added).

We did not hold broadly that the PUC could not allow utilities to recover interest on the CTC balance.

■ The consumer groups argue that even if the Court only invalidated the timing element of Rule 25.263($l$)(3)—the date interest begins to accrue—that portion of the Rule is not severable, and the whole Rule is therefore invalid. The consumer groups provide no persuasive reason why the PUC cannot follow the Court's directive regarding the accrual date but otherwise enforce its Rule by allowing the recovery of interest. The Rule is part of Chapter 25 of Title 16 of the Texas Administrative Code, covering substantive rules of the PUC applicable to electric service providers. Rule 25.3(a) of the same Chapter states that "[i]f any provision of this chapter is held invalid, such invalidity shall not affect other provisions or applications of this chapter which can be given effect without the invalid provision or application, and to this end, the provisions of this chapter are declared to be severable." The PUC thus followed its own severability rule and enforced Rule 25.263($l$)(3), but with an accrual date consistent with *CenterPoint Energy*. We see no error in this approach, which complied with our decision while also enforcing the remainder of the PUC's rule allowing the recovery of interest.

■ By analogy to statutory construction, severability is a question of legislative intent.[50] Here, the body enacting the regulation in issue has expressly stated by general rule that it intends invalid provisions to be severable. Absent an expression of intent regarding severability, the valid remaining portions of a statute remain enforceable if the invalidity of one portion "does not affect other provisions or applications of the [rule] that can be given effect without the invalid provision or application."[51] Here, the PUC was able to otherwise enforce its rule by modifying only the date that interest begins to accrue. It specifically concluded in the Order that PURA's function is not impaired by *CenterPoint Energy*'s invalidation of a portion of Rule 25.263($l$)(3) and that the remainder of the Rule should be given effect.[52] We agree with the PUC that there is no ground to invalidate the entire rule because of the one defect we found in *CenterPoint Energy*. In fact, invalidating the whole rule and barring any recovery of interest whatsoever would *contradict* our view in *CenterPoint Energy* "that the Legislature intended electric utilities to recover carrying costs on stranded costs to compensate for the financial costs incurred during the stranded cost recovery period," consistent with the prior ratemaking principle that "carrying costs on investments

50. *See* Tex. Gov't Code §§ 311.032(a)-(b), 312.013(b).

51. *Id.* §§ 311.032(c), 312.013(a).

52. The Order states that the interest-rate portion of Rule 25.263($l$)(3) is severable from the invalidated accrual start date in the Rule because "[t]here is no logical connection between the accrual of interest at a utility's UCOS WACC [weighted-average cost of capital] and the time period specified by the rule." In Conclusion of Law 12 to the Order, the PUC concludes: "The function of PURA is not impaired by [*CenterPoint Energy*'s ] invalida-

tion of the portion of [Rule] 25.263($l$)(3) that required interest on a utility's true-up balance to accrue starting on the date of the Commission order in the utility's true-up case." Conclusion of Law 13 further reasons: "Because [Rule] 25.263($l$)(3) requires that interest accrue starting on a date not fixed by the rule or PURA, and because such interest would accrue for a period of time that was unknown at the time of adoption of the rule, there is no connection between the interest-accrual start date and the portion of the rule requiring accrual at a utility's UCOS WACC."

in generation plants were included in rates."[53]

GCCC separately argues that regardless of the validity of Rule 25.263(*l*)(3), the 11.075 percent interest rate chosen by the PUC was arbitrary and capricious, and not supported by substantial evidence, because there was no evidence in the record that it reflected CenterPoint's current weighted-average cost of capital (WACC).[54] For several reasons, we are unpersuaded.

 First, given our conclusion that Rule 25.263(*l*)(3) remains valid with the corrected start date mandated by *Center-Point Energy*, we agree with the court of appeals that, as a general proposition, an agency cannot be said to "err or act arbitrarily or capriciously by complying with the mandate of its own rule,"[55] assuming that the rule is based on a valid delegation of legislative authority and is a reasonable exercise of that authority. Indeed, we have stated that if an agency "does not follow the clear, unambiguous language of its own regulation, we reverse its action as arbitrary and capricious."[56]

Second, GCCC does not persuade us that the PUC can as a practical matter constantly re-determine a utility's cost of capital or is required by law to do so. The PUC selected the 11.075 percent rate in the true-up proceeding where a final order issued in December 2004 and in the financing order proceeding where a final order issued in March 2005. This rate was based on the weighted-average cost of capital established in the utility's 2001 unbundled cost-of-service (UCOS) proceeding, adjusted for federal income taxes,[57] and GCCC offers no proof or argument that the earlier proceedings in which Center-Point's cost of capital was determined were flawed. Further, as all parties agree, the PUC in 2006 prospectively reset the interest rate on the CTC to reflect changed economic conditions. The rate was lowered to 8.06 percent.[58]

---

53. *CenterPoint Energy*, 143 S.W.3d at 83.

54. We understand TIEC to argue that the interest rate chosen by the PUC is improper only if Rule 25.263(*l*)(3) is invalidated in its entirety. It argues in its brief on the merits that "[b]ecause the rule was invalidated in its entirety, the use of an 11.075% interest rate is arbitrary and capricious," and that "[b]ecause this Court invalidated the Rule in *CenterPoint Energy*, the Commission had no authority to rely on the Rule by applying the interest rate adopted in the UCOS proceeding."

55. 263 S.W.3d at 458.

56. *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex.1999).

57. As the Order explains, the 11.075 percent rate is "stated on a pre-tax basis. By accruing interest at a pretax rate, CenterPoint will recover the interest due at its actual UCOS WACC, after the effect of taxes."

58. As the court of appeals explained, "[i]n July 2006, the Commission amended rule 25.263(*l*)(3) to both conform to *CenterPoint*

*Energy, Inc.*, and alter the rate methodology." 263 S.W.3d at 457 n. 10 (citing 31 Tex. Reg. 5603 (2006)). And as TIEC explains in its brief on the merits, the revised rule "replaced the interest rate from the utility's WACC as established in the UCOS proceeding with a new method for calculating interest, which relies on updated information regarding the utility's marginal cost of long term debt and results in a significantly lower interest rate.... In response to the new rule, Center-Point made a compliance filing seeking to adjust the interest rate to reflect its current financial status and the risk associated with recovering the CTC balance from ratepayers. CenterPoint agreed to reduce its interest rate, on a going forward basis, from 11.075% to 8.06% based on this new rule." CenterPoint further explains that it agreed to the lower interest rate as part of the settlement of a then-pending rate case. CenterPoint thus contends that since the consumer groups did not appeal the 11.075 percent interest rate selected in the true-up proceeding, they can only complain in today's case about the use of the 11.075 percent interest rate for the period from December 17, 2004, the date of the final

■ Finally, the PUC points to expert testimony in the administrative record offered by CenterPoint that the 11.075 percent interest rate was appropriate given the risk associated with the recovery of CTCs, the fact that the rate was a pre-tax rate that had to be grossed up to ensure the recovery of income taxes on the CTC, the use of the same rate in other proceedings, and other factors. The consumer groups do not challenge the credentials of the expert, whose testimony was offered by CenterPoint to rebut the argument that the previously determined rate had become outdated and that one of several other rates proposed by intervenors and PUC staff should be used. While there was some conflicting testimony on the appropriate interest rate, under the applicable substantial evidence standard of review,[59] we ask only whether some reasonable basis exists in the record for the agency's action.[60] That standard was met here.[61]

In sum, the PUC did not act in an arbitrary or capricious manner in (1) following its own rule, (2) relying on a previously determined cost of capital in proceedings whose fairness is not challenged here, (3) ultimately choosing an interest rate for which a reasonable basis exists in the record, and (4) substantially lowering the interest rate when circumstances warranted.

## B. Control Premium Valuation–Panel Fee

■ The PUC convened the valuation panel under Section 39.262(h)(3) to help determine the market value of transferred generation assets under the PSV method. The PUC retained J.P. Morgan to serve as the valuation panel and approved its $5.2 million fee. J.P. Morgan insisted that CenterPoint guarantee payment of the fee on behalf of Texas Genco. Texas Genco and CenterPoint (then Texas Genco's corporate parent) ultimately signed a contract agreeing to be jointly obliged for the fee, and CenterPoint ultimately paid it. As part of the fee negotiations, CenterPoint sought agreement that PUC staff would support recovery by CenterPoint of the valuation-panel fee. PUC staff agreed not to contest such recovery.

The PUC allowed CenterPoint to recover this fee from ratepayers through the CTC. It found the fee reasonable, and also noted in the Order that "[t]he true-up applicants were required to incur this expense by the Commission, and the expense was necessary for the resolution of the case."

TIEC argues the valuation-panel fee must be borne by Texas Genco, the company receiving the transferred generation assets, and the PUC exceeded its authority

order in the true-up proceeding, until August 1, 2006, the date CenterPoint began using the 8.06 percent interest rate. CenterPoint also points out that some time after August 1, 2006, the CTC balance was securitized. Once the CTC balance was received through a bond offering, the interest rate on the CTC balance earlier assigned by the PUC became irrelevant.

**59.** TEX. UTIL.CODE § 15.001.

**60.** *See Mireles v. Tex. Dep't of Pub. Safety,* 9 S.W.3d 128, 131 (Tex.1999) ("A court applying the substantial evidence standard of re-

view may not substitute its judgment for that of the agency. The issue for the reviewing court is not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action. Courts must affirm administrative findings in contested cases if there is more than a scintilla of evidence to support them.") (citations omitted).

**61.** Under substantial evidence review, "an administrative decision may be sustained even if the evidence preponderates against it." *Id.*

in allowing CenterPoint to recoup the fee through its retail customers. TIEC argues that this sentence from Section 39.262(h)(3) prohibits cost-shifting and requires Texas Genco to incur the fee alone: "The costs and expenses of the panel, as approved by the commission, shall be paid by each transferee corporation." The PUC and CenterPoint respond that Section 39.262(h)(3) only specifies that the transferee (as opposed to the PUC or someone else) is *initially* responsible for paying the valuation-panel fee, but the statute does not limit how the transferee satisfies that obligation or prohibit the PUC from allowing CenterPoint to recover the fee through its rates. They contend that since CenterPoint guaranteed the fee and ultimately paid it, it can recoup it under Section 36.061(b)(2), applicable generally to ratemaking proceedings. Under this provision, the PUC may allow recovery of "reasonable costs of participating in a proceeding under this title not to exceed the amount approved by the regulatory authority." [62]

So does "shall be paid by the transferee corporation" in Section 39.262(h)(3) mean Texas Genco must exclusively underwrite the fee, or does it merely require Texas Genco to cover the fee in the first instance, while letting other law (including Section 36.061(b)(2)) determine how that obligation is ultimately funded or perhaps recouped through rates like other rate-case expenses?

The court of appeals' careful analysis persuades us that CenterPoint and the PUC, whose reasonable construction of PURA merits "serious consideration," [63] have the better argument:

[B]y providing that the transferee corporations "shall pay" valuation panel expenses, the legislature did not intend to preclude those expenses ultimately being recovered through rates under PURA 36.061(b)(2). [Section 39.262(h)(3)], in other words, reflects not a mandate that such expenses be borne exclusively by transferee corporations, as TIEC suggests, but merely an expectation that the expenses would be "paid" by transferee corporations in the same manner that parties to rate proceedings routinely pay legal expenses, consultant fees, and myriad other "costs of participating in a proceeding" that are potentially eligible for later recovery under PURA section 36.061(b)(2). [64]

It is true, as TIEC contends, that state-agency powers are limited, and agencies may not "on a theory of necessary implication from a specific power, function, or duty expressly delegated, erect and exercise what really amounts to a new and additional power or one that contradicts the statute, no matter that the new power is viewed as expedient for administrative purposes." [65] But that admonition is inapposite here.

PURA nowhere discusses the interplay between Sections 36.061(b)(2) and 39.262(h)(3), much less suggests any conflict between them. Contrast that to other examples within PURA where the Legislature acknowledged potential conflicts and clarified which provision would control.[66]

**62.** Tex. Util.Code § 36.061(b)(2).

**63.** *First Am. Title Ins. Co. v. Combs,* 258 S.W.3d 627, 632 (Tex.2008).

**64.** 263 S.W.3d at 462.

**65.** *Pub. Util. Comm'n v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 407 (Tex.1995) (quoting *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137–38 (Tex.App.-Austin 1986, writ ref'd n.r.e.)). *See also Pub. Util. Comm'n v. City Pub. Serv. Bd.,* 53 S.W.3d 310, 316 (Tex.2001).

**66.** *See* Tex. Util.Code §§ 36.007(d), 36.204, 36.351(a), 39.158(d), 39.263(d). In addition, the fact that Section 39.262(h)(3) is the later-

PURA's drafters knew how to resolve perceived inconsistencies, and absent any indication that lawmakers desired one PURA provision to prevail over another, we must presume they wanted both sections here to be fully effective.

 TIEC argues principally that Section 39.262(h)(3) must control because its specific focus on valuation panels gives it a precision that Section 36.061(b)(2)'s ordinary cost-recovery regime lacks. But the specific-controls-over-general maxim "applies only when overlapping statutes cannot be reconciled." [67] Here, we can construe the two provisions in a way that harmonizes rather than conflicts.[68] Section 39.262(h)(3) does not restrict, or even address, how the transferee corporation fulfills its panel-fee obligation. It nowhere prohibits, even implicitly, a transferor corporation from covering a transferee's upfront obligation to pay the valuation-panel fee and later seeking recovery as a "reasonable cost[ ] of participating in a proceeding" under Section 36.061(b)(2).

In short, the provisions do not collide because they govern different subjects—initial payment of the valuation-panel fee (Section 39.262(h)), and separately, the PUC's authority to permit the recoupment of certain rate-case expenses (Section 36.061(b)(2)). True, one provision has a narrower focus, but they are easily harmonized, as the PUC did here. TIEC's construction would create a conflict where none need exist. We agree with the court of appeals' analysis.

enacted provision—and is silent regarding any interplay with Section 36.061(b)(2)—gives additional support for the view that the Legislature intended no impact on PURA's preexisting cost-recovery provision.

67. *Lexington Ins. Co. v. Strayhorn,* 209 S.W.3d 83, 86 (Tex.2006).

### III. Conclusion

We affirm the court of appeals' judgment.

68. *See* TEX. GOV'T CODE § 311.026(a) ("If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both."); *see also Argonaut Ins. Co. v. Baker,* 87 S.W.3d 526, 531 (Tex.2002).