AEP TEXAS CENTRAL COMPANY,
Petitioner,

v.

PUBLIC UTILITY COMMISSION
of Texas, et al., Respondents.

No. 08–0634.

Supreme Court of Texas.

July 1, 2011.

**62** ◼ ▬▬▬▬▬▬▬▬

David C. Duggins, Duggins Wren Mann & Romero, LLP, Robert J. Hearon, Jr., Graves Dougherty Hearon & Moody, PC, Marnie Ann McCormick, Duggins Wren Mann & Romero, LLP, Bret J. Slocum, Clark, Thomas & Winters, Larry W. Brewer, American Electric Power Company, Kerry McGrath, Clark, Thomas & Winters, William Casey Wren, Clark Thomas & Winters Pc and Patrick Joseph Pearsall, Duggins Wren Mann & Romero, LLP, Austin TX, for Petitioner.

Greg W. Abbott, Attorney General of Texas, Elizabeth R.B. Sterling, Environmental Protection & Administrative Law Div. Office of the Attorney General, John R. Hulme, Natural Resources Division, Brian Alan Prestwood, Moltz Morton O'Toole, Jeffrey L. Rose, Attorney General of Texas, David Preister, Office of the Attorney General, Kent C. Sullivan, 14th Court of Appeals, David S. Morales, Office of the Attorney General of Texas Deputy First Assistant Attorney General, Barbara Bryant Deane, Assistant Attorney General, Clarence Andrew Weber, Kelly Hart & Hallman LLP, Nathan M. Bigbee, Daniel C. Wiseman, Office of the Attorney General, Thomas Lane Brocato, Lloyd Gosselink Rochelle & Townsend, P.C., Steven A. Porter, Lloyd Gosselink Blevins Rochelle & Townsend, Laurie Barker, Office of Public Utility Counsel, Bryan L. Baker, Office of the Attorney General, Amalija 'Amy' J. Hodgins, Ruth Ruggero Hughs, Paul D. Carmona, Office of the Attorney General, Mary Taylor Henderson, Office of the Attorney General of Texas Consumer Protection and Public Health Marion Taylor Drew, Office of the Attorney General of Texas Public Agency Representation–Section Chief, Susan M. Kelley, Asst. Atty. General, Austin TX, Tonya Michelle Gray, Andrews Kurth LLP, Dallas TX, Kenneth L. Wiseman, Andrews & Kurth LLP, Thomas R. Kline, Andrews Kurth LLP Mark F. Sundback, Jennifer L. Spina, Andrews & Kurth LLP, Washington DC, Rex D. VanMiddlesworth, Lino Mendiola, Andrews & Kurth LLP, Caren Elizabeth Pinzur, Andrews Kurth LLP, James G. Boyle, Herrera & Boyle, PLLC, Joel Don Ballard, James K. Rourke, Jr. and Suzi Ray McClellan, Office of Public Utility Counsel, Austin TX, for Respondents.

Justice WILLETT delivered the opinion of the Court.

This appeal challenges a final order of the Public Utility Commission in a true-up proceeding under Chapter 39 of the Utilities Code, a part of the Public Utility Regulatory Act (PURA). The district court affirmed the order in part and reversed it in part. The court of appeals affirmed the judgment of the district court in part and reversed it in part.[1] In two recent decisions, we have reviewed PUC orders in true-up proceedings, giving a general description of Chapter 39 and the true-up procedure.[2]

---

**1.** 258 S.W.3d 272, 276.

**2.** *See State v. Pub. Util. Comm'n,* 344 S.W.3d 349, 352–54 (Tex.2011) (*State v. PUC* ); *Tex.*

In today's case, AEP Texas Central Co. (AEP), a transmission and distribution utility, and CPL Retail Energy, L.P., its affiliated retail electric provider, initiated a proceeding under Section 39.262 to finalize stranded costs and other true-up amounts.[3] The State of Texas, several municipalities, and several other parties who are consumers of electricity or represent consumer interests (collectively the Consumers),[4] intervened in the proceeding.

In its final order (Order), the PUC determined stranded costs, which generally are "based on the difference between the book value of generation assets and the market value of these assets."[5] The PUC also made a separate determination of the capacity auction true-up under Section 39.262(d)(2). The issues before us now concern market value, net book value (NBV), and the capacity auction true-up.

## I. Market Value

Generally, "Section 39.262(h) provides that the affiliated power-generation company shall establish the market value of its generation assets using one or more of four methods: the sale of assets method, the stock valuation method, the partial stock valuation (PSV) method, and the exchange of assets method."[6] Section 39.262(h) provides that stranded costs shall be quantified using these methods "[e]xcept as provided in Subsection (i)."

Subsection (i) provides in part: "Unless an electric utility or its affiliated power generation company combines all of its *remaining* generation assets into one or more transferee corporations as described in Subsections (h)(2) and (3), the electric utility shall quantify its stranded costs for nuclear assets using the ECOM method."[7] Subsection (h)(2) pertains to the stock valuation method, and Subsection (h)(3) pertains to the PSV method. These methods involve spinning off assets into a publicly traded corporation. The ECOM method refers to a model developed by the PUC to estimate stranded costs.[8]

In this case, AEP chose to quantify its stranded costs under Subsection (h)(1), the sale of assets method, because it had sold its generation assets including its interest in the South Texas Nuclear Project. The Consumers argue that the market value of AEP's nuclear assets could not be determined using the sale of assets method, because Subsection (i) requires use of the ECOM model for valuing nuclear assets unless the stock valuation or PSV method is used.

■ The PUC ruled that the sale of assets method could be used to determine the market value of nuclear assets, and that Subsection (i), by its terms, is limited to the valuation of "remaining" nuclear assets. It reasoned that once AEP sold its nuclear assets, they were not remaining. Like the court of appeals, we conclude that the PUC's construction of the provision is

---

*Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC,* 324 S.W.3d 95, 97–100 (Tex.2010) (*TIEC* ).

3. Tex. Util.Code § 39.262. All statutory sections cited herein are found in Chapter 39 of the Texas Utilities Code.

4. The issues and arguments discussed below are not all raised by the same Consumers. For brevity we identify any issue or argument

raised by any Consumer as one raised by "the Consumers."

5. *State v. PUC,* 344 S.W.3d at 356.

6. *Id.* at 356.

7. Tex. Util.Code § 39.262(i) (emphasis added).

8. *See State v. PUC,* 344 S.W.3d at 353 n. 15 and accompanying text.

reasonable and should be followed.[9] The PUC's construction gives meaning to the word "remaining," consistent with our view that every word in a statute is presumed to have a purpose and should be given effect if reasonable and possible.[10] The PUC construction is also consistent with the last sentence of Subsection (h)(1), providing that "[i]f not all assets are sold" through a sale of assets, "the market value of the remaining generation assets shall be established by one or more of the other methods in this section." A plausible reading of Section 39.262(i) is that it provided a backup method, namely the ECOM method, for assigning a market value to a nuclear plant that might prove difficult to sell or exchange, and hence would be a "remaining" asset of the utility, and that stock market conditions might also make spinning off the plant into a publicly traded company difficult.

Further, we have noted that "[w]hile other methods are provided to determine market value indirectly, we think the actual sale of all the generation assets ... provides the best measure of market value,"[11] in part because Section 39.251(4) generally defines market value as "the value the assets would have if bought and sold in a bona fide third-party transaction or transactions on the open market." By its language this statutory definition applies to "nonnuclear assets and certain nuclear assets."[12] Where, as here, the utility managed to sell its stake in a nuclear plant, we see no error in using the sale of assets method, which is, if anything, the preferred method for valuing generation assets. There is nothing sacrosanct about the ECOM computer model, which turned out to be a very inaccurate predictor of stranded costs.[13] Further, as the PUC urges, if under Section 39.251(4) the market value of "certain nuclear assets" is the value obtained in a "bona fide third-party transaction or transactions on the open market," Subsection (i) should not be read to impose a categorical prohibition against using the sale of assets method set out in Subsection (h)(1) to value nuclear assets. Such a reading would conflict with Section 39.251(4), which contemplates that at least "certain nuclear assets" can be valued using the sale of assets method. The PUC's interpretation of the relevant statutory provisions is reasonable and gives meaning and consistency to each of the relevant statutory terms.

## II.  Net Book Value

### A.  Excess Mitigation Credits

The PUC required AEP to issue excess mitigation credits to customers based on interim projections that AEP would have no stranded costs. The projections turned out to be erroneous, and at the true-up proceeding, the PUC reasoned that the EMCs, including the EMCs paid to the affiliate retailer CPL Retail Energy, had by design increased the net book value (and decreased stranded costs) on a dollar-for-dollar basis, and accordingly stranded costs should reflect the total amount of EMCs paid. In *State v. PUC*, we affirmed

9. *See id.* at ("[A]n agency's interpretation of the statute it administers is entitled to serious consideration so long as it is reasonable and does not conflict with the statute's language.").

10. *See Tex. Workers' Comp. Ins. Fund. v. DEL Indus., Inc.*, 35 S.W.3d 591, 593 (Tex.2000).

11. *State v. PUC*, 344 S.W.3d at 361.

12. Tex. Util.Code § 39.251(4).

13. At one point, the ECOM model predicted "that no generation company was projected to have stranded costs," *CenterPoint Energy, Inc. v. Pub. Util. Comm'n*, 143 S.W.3d 81, 91 (Tex.2004), but ultimately billions of dollars in stranded costs were assessed at the final true-ups of the utilities subject to Chapter 39.

the PUC's order regarding the identical treatment of EMCs in the CenterPoint true-up proceeding.[14] We reversed the court of appeals' judgment on this issue.[15]

In today's case, the same court of appeals remanded this issue to the PUC for reconsideration in light of its decision in the CenterPoint true-up case and its decision in another case holding that the PUC never had authority to issue EMCs.[16]

■ AEP argues that the PUC did not err in including in stranded costs all EMCs that had been paid. The Consumers argue that stranded costs should be reduced by the amount of EMCs paid by AEP to its affiliated retail provider, CPL Retail Energy. Consistent with our decision in *State v. PUC*, we agree with AEP that no adjustment to the PUC's calculation of stranded costs is warranted to account for EMCs paid to CPL Retail Energy. We rejected the same argument in *State v. PUC*, reasoning that regardless of whether the EMCs were paid to the affiliated retail electric provider or another retail provider, "the purpose of the EMCs was to increase the NBV of CenterPoint's generation assets,"[17] the impact on stranded costs was the same, and "CenterPoint should recover whatever stranded costs it would have recovered if the EMCs had never been paid."[18]

AEP separately argues that the PUC miscalculated interest on the excess earnings. In this proceeding, the PUC calculated interest on stranded costs monthly, running from January 2002. As discussed further below, the interest rate and the start date for the running of interest were correct under our holdings in *TIEC*. Schedule II to the Order shows the PUC's calculation of interest on the stranded cost true-up award, with the column for net book value increasing monthly to reflect the unrefunded EMC balance. The EMCs, by design, increased the net book value and were credited against excess earnings, and therefore correspondingly increased stranded costs and the interest on the principal amount of stranded costs. We see no error in the PUC's treatment of interest in this true-up proceeding. We are not persuaded by AEP's argument that the Order double-counted interest.[19]

## B. Construction Work in Progress

The Consumers complain that the PUC erred in including construction work in progress (CWIP) in the net book value determination. They argue that ratemaking standards must be met before the inclusion of CWIP in net book value. We rejected this argument in *State v. PUC*.[20]

## C. Adjustments to NBV for Commercially Unreasonable Conduct

AEP argues that once the PUC determined market value by concluding that the

14. *State v. PUC*, 344 S.W.3d at 364.

15. *Id.*

16. 258 S.W.3d at 295–96 (remanding for reconsideration in light of *CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 252 S.W.3d 1 (Tex.App.-Austin 2008), rev'd in part sub nom. *State v. Pub. Util. Comm'n*, 344 S.W.3d 349 (Tex.2011), and in light of *Cities of Corpus Christi v. Pub. Util. Comm'n*, 188 S.W.3d 681 (Tex.App.-Austin 2005, pet. denied)).

17. 344 S.W.3d at 364.

18. *Id.* at 364.

19. The PUC suggests in its briefing that some recovery of interest on retained excess earnings should be made on remand of the PUC docket that ordered the EMCs. We express no opinion on this question, and our decision today is not intended to foreclose an adjustment to interest on excess earnings in another proceeding.

20. 344 S.W.3d at 377.

sale of its generation assets was, under Section 39.262(h)(1), a bona fide sale under a competitive offering, the PUC was not free to adjust net book value to account for specific instances of commercially unreasonable conduct that affected the value of its generation assets. The Consumers argue that not only is an adjustment to NBV permitted, but the PUC did not make sufficiently large reductions to NBV to account for AEP's commercially unreasonable conduct. A majority of the court of appeals agreed with AEP that an adjustment to NBV was not permitted in these circumstances.[21] The dissenting justice agreed with the PUC that an adjustment to NBV was permitted, and would have rejected the arguments of the Consumers that greater adjustments should have been made by the PUC.[22]

■ On these issues, we agree with the PUC across the board. First, we agree that commercially unreasonable conduct can result in a reduction to net book value even when the PUC uses the sale of assets method to determine market value, and finds that the sale of assets was "a bona fide third-party transaction under a competitive offering," as specified in Section 39.262(h)(1).

Section 39.252(d) provides:

An electric utility shall pursue commercially reasonable means to reduce its potential stranded costs, including good faith attempts to renegotiate above-cost fuel and purchased power contracts or the exercise of normal business practices to protect the value of its assets. The commission shall consider the utility's efforts under this subsection when determining the amount of the utility's stranded costs; provided, however, that

nothing in this section authorizes the commission to substitute its judgment for a market valuation of generation assets determined under Sections 39.262(h) and (i).

A similar issue arose in *State v. PUC.* We held that market value should be determined under the sales of assets method, concluding that the sale of assets in that case "was indeed 'a bona fide third-party transaction under a competitive offering'" as provided in Subsection (h)(1).[23] We then considered whether a separate transaction called the "RRI Option" was commercially unreasonable conduct that should result in a reduction in NBV. We discussed whether the Option had depressed the market value of the affiliated power generation company, and concluded the option had no effect if the sale of assets method was used, since the sale of the assets took place after the Option expired.[24] Before reaching this conclusion, however, we accepted the legal proposition that a reduction in NBV is permitted if commercially unreasonable conduct had negatively affected the market value of the utility's assets:

The PUC could consider the commercial reasonableness of the RRI Option in determining NBV. The PUC adjusted NBV in making the stranded cost determination, after finding that the conveyance of the Option was commercially unreasonable and did not represent normal business practices. Section 39.252(d) expressly directs the PUC, when making the stranded cost determination, to consider whether the utility used "commercially reasonable means" and "normal business practices" to reduce stranded costs. Since Section

**21.** 258 S.W.3d at 308–14.

**22.** *Id.* at 287–93 (Patterson, J., dissenting).

**23.** 344 S.W.3d at 361.

**24.** *See id.* at 365.

39.252(d) bars the PUC from adjusting the market value component of stranded costs, it necessarily authorizes an adjustment to NBV, the other principal component of stranded costs.[25]

Hence, we accepted, as we do here, that even if the sale of assets is, overall, sufficiently "bona fide" and "competitive" to qualify for a market value determination under Section 39.262(h)(1), commercially unreasonable conduct by the utility affecting the value of the assets sold is subject to an adjustment to net book value under Section 39.252(d). This authority flows from Section 39.252(d), requiring the PUC, when determining stranded costs, to consider whether the utility engaged in "commercially reasonable" conduct and "normal business practices." This authority also flows from Section 39.252(a), providing that a utility may only recover its "nonmitigable" stranded costs, and Section 39.262(a), providing that a utility "may not be permitted to overrecover stranded costs" at the true-up proceeding. These provisions should be read together in construing Chapter 39.[26] In harmonizing the provisions as it did, the PUC was able to make a market value determination under Section 39.262(h)(1), an essential step in determining stranded costs, while still giving effect to the Section 39.252(d) duty to mitigate stranded costs. While there is obviously some overlap between the concepts of a "bona fide" and "competitive"

sale under Section 39.262(h)(1), and the concepts of "commercially reasonable means" and "normal business practices" under Section 39.252(d), the PUC reasonably harmonized these provisions, gave meaning to both, and conformed to the overall goal of awarding the utility its nonmitigable stranded costs.

In today's case, the utility's election to use the sale of assets method under Section 39.262(h)(1), and a PUC finding that the sale of assets was conducted through a bona fide and competitive sale,[27] does not preclude an adjustment to NBV under Section 39.252(d) for specific, commercially unreasonable conduct. The language of Section 39.262(h) requires the utility to "quantify its stranded costs using one or more of the following methods," but Chapter 39 as a whole provides "that the PUC ultimately determines stranded costs.... The true-up procedure set out in Chapter 39 unmistakably assigns the Commission to act as an adjudicative body in 'determining the amount of the utility's stranded costs' and issuing a 'final order' in the true-up proceeding, subject to judicial review."[28] The PUC's authority to ultimately determine stranded costs carries with it the authority to make particularized adjustments to net book value to account for commercially unreasonable conduct. While Section 39.252(d) states that the PUC shall not, in considering whether the utility used commercially rea-

**25.** *Id.* at 366.

**26.** *See State v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002) ("[W]e determine legislative intent from the entire act and not just from isolated portions."); *State v. Pub. Util. Comm'n,* 883 S.W.2d 190, 196 (Tex.1994) ("In ascertaining the scope of the Commission's authority, we must read PURA as a whole to ascertain the underlying legislative intent.").

**27.** In concluding that AEP's auction of its generation assets met the test of a bona fide transaction under a competitive offering, the PUC was persuaded by evidence that AEP used competent and independent advisers, engaged in broad marketing efforts, employed an auction structure that promoted competitive bids, provided bidder access to equal and accurate data, and negotiated vigorously with bidders.

**28.** *State v. PUC,* 344 S.W.3d at 366 (quoting Sections 39.252(d) and 39.262(j)).

sonable means to reduce stranded costs, "substitute its judgment for a market valuation of generation assets determined under Sections 39.262(h) and (i)," the PUC did not "substitute its judgment" as to the market-based methods set out in Chapter 39 for determining market value. It accepted AEP's election to employ the sale of assets method to determine market value, but made authorized NBV adjustments to account for specific instances of commercially unreasonable conduct by AEP prior to the sale of those assets that negatively affected the prices received. Therefore, we disagree with the court of appeals that employment of the sale of assets method to determine market value under Section 262(h)(1) automatically and necessarily means that the PUC can make no adjustments to NBV under the separate Section 39.252(d) duty to mitigate stranded costs. The authority to review the commercial reasonableness of specific utility conduct in selling generation assets derives from the nature of stranded-cost recovery and the effect it might have on normal business incentives. Conduct that unreasonably reduces the price of assets sold will reduce the proceeds of the sale, one measure of market value, but such a reduction simply increases the stranded cost recovery on a dollar-for-dollar basis, since stranded costs are measured by the difference between book value and market value. To counter this lack of incentive to minimize stranded costs, the Legislature empowered the PUC to make adjustments to net book value under Section 39.252(d).

Our agreement with the PUC and the court of appeals dissent that an NBV adjustment is allowed in these circumstances leaves the question whether the PUC's dollar adjustments to NBV are supported by substantial evidence. After considering numerous alleged instances of commercially unreasonable conduct, the PUC made two adjustments to NBV. AEP argues that one of the adjustments was too large, while the Consumers complain that both of the adjustments were too small.

■ Under substantial evidence review of fact-based determinations, "[t]he issue for the reviewing court is not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action." [29]

■ The PUC reduced AEP's net book value by $68.7 million on grounds that AEP's conduct before the sale of its interest in the South Texas Nuclear Project was commercially unreasonable. It found fault in AEP's failure to prepare an adequate pre-sale valuation analysis so that it had an estimate of the intrinsic value of its interest, and to establish ahead of the sale a "walk-away" or reserve price. It arrived at the $68.7 million figure by comparing the price received by AEP and the price received by Texas Genco (Genco), a co-owner of the Project that also sold its interest. This figure was based on the relative sizes of the interests sold by the two companies. AEP and the Consumers, relying on conflicting evidence in the record, argue that the PUC miscalculated the relative sizes of the Genco and AEP interests. AEP further argues that the PUC offered no rational explanation for how its alleged unreasonable conduct affected the price for its interest in the Project. We have reviewed the evidence and conclude that the PUC's calculation is supported by substantial evidence. The PUC gave rational reasons for the disallowance.[30] The

---

29. *Id.* at 355–56 (quoting *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex.1999)).

30. The PUC plausibly reasoned in its Order:

If [AEP] had determined an intrinsic value for its STP share, and established a walk-away price, it may have attempted to negotiate a higher price for STP, modified its

Consumers concede that the sale of the Genco interest "was part of an extremely complex transaction" and the comparison with the sale of AEP's interest in the same nuclear project was not at all straightforward. The PUC relied on documentary and testimonial evidence relating to the Genco transaction that provides a reasonable basis for the PUC's calculation, thus satisfying the substantial evidence standard.

The PUC also made an $8 million adjustment to NBV on grounds that AEP had unreasonably bundled the sale of its Coleco Creek coal-fired plant with other plants instead of considering whether it could obtain a higher price by selling this plant separately. It noted that AEP had sold the bundled facilities for less than one bidder had offered for Coleco Creek plant by itself. The Consumers argue that a much greater adjustment was warranted. The PUC considered conflicting evidence and argument on this issue. In response to AEP's contention that the other plants actually had negative value, the PUC noted evidence that AEP "was only concerned about selling these facilities as generation units, rather than examining other options such as selling the facilities for their land, parts and scrap metal, or the water rights associated with the facilities." The PUC relied on an actual "nonconforming" bid for the Coleco Creek plant by itself, and compared that bid to the sale price of the bundled assets in reaching the $8 million figure. The bid was nonconforming in that it did not fully comply with AEP's bidding instructions, but the PUC argues that evidence on which the Consumers relied were not actual bids at all, but less reliable evidence such as sales of allegedly similar plants or expressions of interest that occurred before the potential bidder had conducted any due diligence. Given the conflicting evidence and reasonable inferences to be drawn therefrom, the PUC's adjustment is sustained under the substantial evidence test.

The Consumers also argue that the PUC should have made a further adjustment to NBV because AEP failed to execute "bridge power sales" agreements relating to the sale of certain assets. Some of the generation assets were sold under agreements that closed at a future date. AEP received the profits from these assets during the period between the signing of the agreements and the transfer of the assets to the buyer. Under a bridge power sales agreement, the purchaser of generation facilities receives the profits from power sales while the sale is pending. The Consumers argue that such agreements would have increased the calculated market value of the assets and correspondingly reduced stranded costs. The PUC, district court, and court of appeals have all rejected this argument.[31] The PUC points out that no statute requires a bridge power sales agreement or an adjustment to stranded costs to reflect profits earned between the time a sale of assets is negotiated and the formal transfer of those assets to the purchaser. The PUC further considered expert testimony that bridge power sales agreements are not a normal business practice due to regulatory uncertainties in

---

auction procedure to ensure that it obtained such a price, or ceased negotiations and either reopened bidding or considered pursuing another valuation method if it became apparent that the auction results would not approach this price. Obtaining a walk-away price, referencing it throughout the auction process, and modifying or ter-

minating the sale if the offered price does not approach the walk-away price are all measures that a commercially reasonable seller would take to maximize the sales price of an asset.

31. *See* 258 S.W.3d at 293, 314–15.

finalizing the sale of generation assets. The PUC's ruling that such agreements were not mandated under a commercial reasonableness standard is affirmed under the substantial evidence test.

■ AEP argues that, assuming the NBV adjustments were legally and factually warranted, the PUC erred in "grossing up" the disallowances to reflect the federal corporate income tax benefits of the adjustments to stranded costs. The PUC adjustments had lowered stranded costs, with the result that AEP would owe less tax on stranded costs than anticipated. But the utility already had an accumulated deferred federal income tax (ADFIT) account to pay taxes that it now would not owe. The PUC concluded that without the gross up to reflect the effect of taxes, AEP would retain funds in its ADFIT account for the payment of taxes collected from rates charged to customers in previous years that would never be paid, resulting in an overrecovery of stranded costs.[32]

We see no error in the PUC approach. With the benefit of expert testimony, the PUC concluded that without the gross ups an overrecovery of stranded costs would occur, because straight-line depreciation is used for ratemaking while accelerated depreciation is used for paying taxes to the IRS. The result of these divergent depreciation methods is that the ADFIT account to pay income taxes accumulates funds in the early years of an asset's life, as regulatory tax expense paid by ratepayers exceeds the actual tax expense, and then reverses in the later years. The excess funds from early years are held in the ADFIT account and then paid out in later years. Grossing up the adjustment assured that AEP would not receive a windfall in the form of customer charges to cover taxes that would never be paid. As one expert opined, without the gross ups AEP would retain a tax benefit that partially offset the disallowances, resulting in "the government partially subsidizing the disallowance[s]."

Grossing up a true-up amount to reflect the effect of taxes is not novel to this case. We have recognized, in the ratemaking context, that "[t]he propriety of including all taxes among cost of service expenses has been long established."[33] In *TIEC*, we affirmed a PUC order in a Chapter 39 case that authorized the utility to recover a competition transition charge.[34] The charge allowed the utility to recover a true-up award where carrying costs were grossed up to assure the utility an appropriate after-tax return.[35] The gross-up worked in the utility's favor in that case, and in today's case, the interest rate AEP received on its stranded costs was also grossed up.

## III. Capacity Auction True–Up

■ AEP complains that the PUC and the court of appeals erred in declining to base the capacity auction true-up under Section 39.262(d)(2) on actual prices obtained in the capacity auctions it conducted under Section 39.153. Specifically, it contends: "The court of appeals erred by upholding an order that disregards the true-up statute and rule, both of which prescribe a formula that must be applied regardless of whether a utility sells 15% of its capacity at auctions in compliance with

---

**32.** *See* § 39.262(a) (providing that a utility "may not be permitted to overrecover stranded costs" at the true-up proceeding).

**33.** *Suburban Util. Corp. v. Pub. Util. Comm'n,* 652 S.W.2d 358, 363 (Tex.1983).

**34.** 324 S.W.3d at 97.

**35.** *Id.* at 104 n. 57.

the statute and rule that govern the auctions themselves." We agree.

AEP contends that due to lack of market demand it was unable to sell the full 15 percent of its capacity specified in Section 39.153 and PUC rules thereunder specifying four separate gas products, but that the Section 39.262(d)(2) capacity auction true-up should still be based on the prices actually obtained in the capacity auctions conducted under Chapter 39. The same issue arose in *State v. PUC,* and we agreed with the utility, as we agree with AEP today, that "Section 39.262 unambiguously specifies that the statutory capacity auction price, not some other blended price the PUC finds more appropriate, must be used in calculating the capacity auction true-up amount." [36] On remand, the PUC must recalculate the capacity auction true-up in a manner consistent with our decision in *State v. PUC,* rather than relying on the proxy price it selected in the true-up proceeding.

## IV. Interest on Stranded Costs

The Consumers argue that interest on stranded costs should not have been assessed under PUC Rule 25.263(*l*)(3). They argue that we invalidated the Rule in *CenterPoint Energy, Inc. v. Public Utility Commission.*[37] The PUC contends that we only invalidated the date on which interest began to run, not the interest rate. In *TIEC,* we agreed with the PUC on this issue.[38] The PUC therefore correctly applied Rule 25.263(*l*)(3), with a modified start date, in calculating interest on stranded costs.

## V. Conclusion

We grant the petition for review, and without hearing oral argument,[39] affirm in part and reverse in part the court of appeals' judgment, and remand this case to the PUC for further proceedings consistent with this opinion.